SECOND DIVISION

No. 1-08-0354

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| v. | ) | |
| | ) | |
| RODERICK T. ALLEN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | Honorable Arthur F. Hill, |
| | )) | Jr., |
| | | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial in which defendant Roderick Allen represented himself *pro se*, defendant was found guilty of first-degree murder and home invasion and was sentenced to consecutive 60-year and 25-year terms of imprisonment, respectively.  On appeal, defendant contends: (1) the cause must be remanded for a hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); (2) he was not mentally competent to represent himself *pro se* pursuant to Indiana v. Edwards, 554

1-08-0354

U.S. ____, 171 L. Ed. 2d 345, 128 S. Ct. 2379 (2008); (3) his waiver of trial counsel was invalid; (4) the State's comments in its opening statement and closing argument were prejudicial; and (5) the trial court should have used a separate verdict form for felony murder instead of a general verdict form for murder. For the following reasons, we affirm the judgment of the circuit court.

BACKGROUND

Defendant was convicted of the first-degree murder of the victim, his sister, Debbie Whitebear. The record indicates that on August 7, 2004, defendant entered his mother's home at 9043 South Cornell Avenue in Chicago and stabbed his sister several times in the chest, causing her death. Defendant's theory of the case, which he maintained throughout pretrial, trial and posttrial proceedings, was that he stabbed the victim to protect their elderly mother from the victim's abuse and that his siblings were keeping the existence of a real-estate trust, of which defendant was the beneficiary, secret from him. Defendant's theory also included his belief that his father, Claude W. Allen, Jr, who was deceased, was responsible for the disappearance of numerous missing persons, which he urged police officers and the State's Attorney's office to investigate. Defendant additionally maintained that Claude W. Allen, Jr., was not his real father and his real father was an individual named Carl Lewis, from whom he stood to inherit the proceeds of a real-estate trust.

The pretrial proceedings in this case were quite lengthy due in part to defendant being found not mentally fit to stand trial as well as defendant proceeding *pro* se.

2

Judge Thomas R. Sumner presided over defendant's pretrial proceedings. On September 2, 2004, Assistant Public Defender John Coniff was appointed to represent defendant. Defendant objected to the public defender's representation. The half sheet indicates that a behavorial clinical examination was ordered by the court.

Dr. Deborah Ferguson, a licensed clinical psychologist, interviewed defendant and submitted her report, which was dated December 27, 2004. Her report indicated that she found defendant fit to stand trial, but was unable to render an opinion regarding defendant's sanity at the time of the offense. The report also noted that although defendant denied having any delusions or paranoia, he blamed his life circumstances on the fact that his "step-father" was never prosecuted for being a serial killer and his belief that his siblings had conspired to prevent him from receiving an inheritance from a real-estate trust. The report noted that it was unclear whether these beliefs were delusional in nature or had some basis in fact.

The court ordered another behavorial clinical examination, which was conducted by Dr. Jonathon Kelly, a psychiatrist, on January 3, 2005. Dr. Kelly's report indicated that defendant was fit to stand trial, but did not reach an opinion regarding defendant's sanity at the time of the offense.

On January 27, 2005, defendant filed a *pro se* motion for withdrawal of the public defender. Defendant's attached affidavit indicated that he was displeased with the court proceedings that had occurred, his counsel was in collusion with the prosecutor and the prosecutor had tried to intimidate him and retaliate against him. He made

further reference to a prior court proceeding in which he accused assistant State's Attorneys and a trial judge of ignoring "the documented exploits of a serial child killer, one Claude W. Allen Jr *** and proceeded to maliciously prosecute the then and now defendant, Roderick T. Allen, in order to facilitate Claude Allen's efforts to cheat Roderick Allen of an inheritance."

Also on that date, the court ordered another behavorial clinical examination regarding defendant's sanity in part because of defendant's request to represent himself. Pursuant to the court's order, Dr. Nishad Nadkarni, a psychiatrist, interviewed defendant on February 23, 2005, and found defendant fit to stand trial.

In March 2005, defendant filed several *pro se* motions including a motion concerning the criminal background of Claude W. Allen, Jr., as well as a motion seeking all financial records of his mother and siblings with respect to a real-estate trust. Defendant also sought documents relating to an altercation he had with his brother, Quintin Allen.

Dr. Peter Lourgos, a psychiatrist, interviewed defendant on April 19, 2005, and found defendant unfit to stand trial. Specifically Dr. Lourgos stated "[a]lthough Mr. Allen is able to state his charge, describe the roles of various courtroom personnel, and describe basic courtroom procedures, he appears to be harboring numerous persecutory delusions regarding his attorney, the [S]tate's [A]ttorney, and the judge." Dr. Lourgos further stated that defendant's "written motion and requests to the court are replete with delusional material *** [which is] substantially impairing his ability to

4

effectively assist counsel in his defense."

The court held a hearing on May 10, 2005, in which it ordered Drs. Ferguson, Kelly and Nadkarni to review defendant's *pro se* motions and update their opinions regarding his fitness.

The court held a fitness hearing on June 1, 2005. Defendant was represented by the public defender at the hearing. Drs. Ferguson, Kelly and Lourgos testified that defendant was not fit to stand trial. They all agreed that defendant understood the charges against him and the courtroom proceedings, but questioned whether he would be able to assist in his defense. They all diagnosed defendant with psychotic delusional disorder. Defendant's delusions included his belief that his sister, his counsel, the judge and the prosecutor were working together to "railroad" him, and his numerous *pro se* filings were "out of touch with reality." However, Dr. Nadkarni stated that he found defendant fit to stand trial. Dr. Nadkarni based his opinion on the fact that defendant provided rational and logical reasons for his *pro se* motions and defendant had written some of the information in his motions based on his anger with how his case was proceeding in court. The jury found defendant unfit to stand trial, but determined that he could be restored to fitness within a year of treatment. Defendant was remanded to the Department of Mental Health and remained at the Chester Mental Health Center for six months where he was treated without medication.

On February 1, 2006, Dr. Kelly found defendant fit to stand trial. Specifically, Dr. Kelly found that defendant "has an understanding of the charges against him,

5

consequences of a plea, judgment or sentence, the functions of the participants in the trial process and the nature and purposes of proceedings *** and found defendant able to assist in his defense." Defendant, through counsel, stipulated to the report. The court made a finding that defendant had been restored to fitness and therefore was fit for trial.

In June 2006, defendant again filed numerous *pro se* motions, including a motion to proceed *pro se*. The trial court advised defendant that he would be held to the same standards as an attorney, to which defendant replied he understood. The court then noted, "I believe that because of the motions that you've filed and things that you've done so far, notwithstanding the fact that you were referred to the Department of Mental Health, it appears to me that you may be capable of doing this on your own." The court then discharged defendant's attorney.

Defendant's additional *pro se* motions included a motion to dismiss based on a speedy trial violation, a motion alleging a Brady violation with respect to the fitness hearing jury, and several motions for substitution of judge. Throughout the pretrial proceedings defendant filed approximately 13 motions for substitution of judge, which were all denied.

At a hearing on May 8, 2007, the court told defendant:

"Mr. Allen, I'm going to tell you this. I've been trying to make sense of where you're going with much of this. A lot of this we've covered and I'm not sure you are understanding what's going on here in terms of - - I'm

6

trying not to prevent you from asserting your defense but I really have some concerns and I'm just going to say this for the record. I have some concerns about what's going on here in terms of what it is that you are doing and how you are proceeding and your perception about our proceedings here and so I have a *bona fide* doubt once again about whether or not you are fit to stand trial. And, I'm going to have you examined once again. Just to be certain."

Dr. Kelly examined defendant on May 23, 2007, and found defendant fit for trial.

Defendant's case was transferred to Judge Arthur F. Hill, Jr., for a jury trial that commenced on November 13, 2007. The court reviewed the waiver of counsel with defendant and defendant confirmed that he still wanted to represent himself. The report of proceedings indicates that defendant informed the court that he was 51 years old and had graduated from the University of Illinois in 1981 with an engineering degree. The court told defendant:

"I can see that you are a very articulate and very intelligent man. And I say these things first off so the record is clear, also to let you know that I have a bit of a feel for you in terms of your intelligence and your articulation."

At trial, Paula Powers, who is also defendant's sister, testified that their mother, Frances Allen, suffered from Alzheimer's and dementia and the victim, their sister, Debbie, had moved into their mother's home to help take care of her. Powers became

7

their mother's legal guardian through guardianship proceedings after their mother had been diagnosed with Alzheimer's and dementia. According to Powers, their mother did not allow defendant inside the house because defendant had threatened to kill Debbie for the last 20 years. She further stated that Debbie had numerous restraining orders filed against defendant. On cross-examination, defendant asked Powers if she knew of anyone else claiming to be defendant's father, to which she responded in the negative.

Mary Exson testified that she is Frances Allen's caregiver. She stated that on the morning of August 7, 2004, she and Frances left the house to go to the store. When they left, she saw defendant standing outside the house. When they returned, defendant was still standing outside the house. Defendant helped his mother out of the car and up the stairs to the front porch. Frances wanted to keep talking with defendant but Exson tried to get her to come inside the house. Exson knew that defendant was not allowed inside the house. Debbie came out of the house and grabbed Frances to get her inside the house. Defendant entered the house and hit Debbie several times in the back of the head and neck, knocking her to the ground. Defendant straddled Debbie, held his hand over her neck and removed a knife from his pocket. Exson ran outside and yelled for help. She saw defendant pull down a window curtain and then Frances came out of the house. On cross-examination, defendant questioned Exson about Debbie's pets that lived in the house, stating that there were three cats and three dogs. Exson denied any knowledge of Debbie using her dog to abuse Frances. Exson also stated that Debbie had told her of a prior instance in which defendant tried to

8

attack Debbie.

Kenneth Brooks testified that he was working in the yard several houses away from Frances Allen's house when he saw a woman come out of the house yelling "help" and "he's got a knife." Brooks alerted a neighbor, Shirley Brown, who was a police officer. Brooks saw another woman come out of the house and then someone inside slammed the front door shut and closed the front window curtain.

Officer Shirley Brown testified that when she approached the house she tried to get in the front door and back door but they were both locked. She further stated that she made two telephone calls to 9-1-1.

David Welsh, a firefighter with the Chicago fire department, testified that when he arrived on the scene, he saw the victim lying face-down in a pool of blood. She had multiple stab wounds to the chest area around the heart.

Defendant was apprehended later that evening. Detective John Fassl testified that he interviewed defendant at the police station that evening. After advising defendant of his Miranda rights, defendant stated that he had gone to his mother's house that morning, but Debbie would not let him inside. He walked around the neighborhood and then returned to the house and sat on the front porch. When his mother returned from the store, he helped her out of the car but Debbie would not let him inside the house and he became upset. He admitted to pushing Debbie and stated, "I just snapped." Defendant declined to talk further. Detective Fassl noticed some spots on defendant's shorts that appeared to be dried blood. He placed the

shorts in an evidence bag for testing.

Lisa Fallara testified she is a forensic scientist in the areas of biology and DNA analysis and is employed with the Illinois State Police Forensic Science Center. She tested the shorts defendant had been wearing for the presence of blood and found that they tested positive. She sent the shorts to a private forensic company for further testing. Michael Cariola, a representative from the Bode Technology Group, testified that the blood found on the shorts matched the victim's blood sample.

Dr. Valerie Arangelovich testified that she conducted an autopsy on the victim. The victim had three stab wounds to her chest and multiple incised wounds on her hands, which are also referred to as defensive wounds. Dr. Arangelovich determined the cause of death was from multiple stab wounds and she classified the manner of death as homicide. On cross-examination, Dr. Arangelovich stated that she did not find any evidence of the victim having been grabbed by the neck or hit in the back of the head or neck.

Defendant testified on his own behalf. He admitted to stabbing the victim twice, but speculated that an officer who came on the scene later inflicted the third stab wound. He stated that he stabbed Debbie in order to protect their mother from Debbie's ongoing abuse. Defendant claimed that Debbie forced their mother to engage in acts of beastality with Debbie's dog, Debbie fed their mother substances that were not fit for human consumption and that on one occasion, their mother was left on the floor for several hours because she was unable to get up. On cross-examination,

defendant admitted that his mother had not told him about any abuse, but that he could tell she had been abused by the look on her face and they way she leaned on him when he helped her up the stairs that day.

The jury found defendant guilty of first degree murder and home invasion. Defendant now appeals.

ANALYSIS

Batson Issue

On appeal, defendant first contends that the cause must be remanded for a hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), because the trial court improperly collapsed the three-step Batson procedure when it denied defendant's Batson objection.

In Batson, the Supreme Court held that it was a violation of the equal protection clause of the fourteenth amendment for the prosecution to use a peremptory challenge to exclude a prospective juror solely on the basis of race. Batson, 476 U.S. at 89, 90 L. Ed. 2d at 82-83, 106 S. Ct. at 1719, The Batson Court provided a three-step procedure for evaluating claims of discrimination in jury selection. Mack v. Anderson, 371 Ill. App. 3d 36, 44 (2006). First, the moving party must make a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. Mack, 371 Ill. App. 3d at 44. Second, if the moving party makes a *prima facie* showing, the burden shifts to the nonmoving party to articulate a race-neutral reason for excluding each of the venirepersons in question. Mack, 371 Ill. App. 3d at 44. Third, the trial court

11

evaluates the reasons provided by the nonmoving party as well as the moving party's claim that the proffered reasons are pretextual.  Mack, 371 Ill. App. 3d at 44.

To satisfy Batson's first stage of making a *prima facie* showing, the moving party must produce evidence sufficient to permit the trial court to draw an inference that discrimination has occurred.  People v. Hogan, 389 Ill. App. 3d 91, 99 (2009).  The court must consider the totality of the relevant facts and all the relevant circumstances. To determine whether a *prima facie* showing has been established, the court may conduct a "comparative juror analysis," as well as consider additional factors, such as: (1) the racial identity between the party exercising the peremptory challenge and excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses in the case.  Hogan, 389 Ill. App. 3d at 99-100.  We will not overturn the trial court's determination on a Batson claim unless it is clearly erroneous.  People v. Davis, 233 Ill. 2d 244, 261 (2009) (Davis II).

After *voir dire*, but before the jury had been sworn in, the court informed defendant and the State that one of the jurors had a medical emergency and would be

dismissed from the jury. The court suggested that the first alternate juror, Mr. Macon, be put on the jury. Defendant did not object to the court's suggestion, but instead informed the court that he was filing a "Motion To Discharge Jury Panel." Defendant's motion alleged that the jury panel should be discharged "due to the exclusion of all men of African blood from the jury" because "the State removed every person who was male and of the defendant's race from the jury." The one-page motion alleged no specific facts to support the allegation of discrimination. The court noted that Mr. Macon was African-American, and the following colloquy then occurred:

"THE COURT: You can feel free to file it at your leisure. I will say that, I will say that as I observed the jury selection process, there was no indication of any purposeful disqualification of any juror of any race, color, or creed, as I watched the process. I listened to the responses of many of the jurors. It should be noted that some of the jurors who happened to be African-American males were trying their best to get off the jury. Some were challenged for cause successfully. That was agreed to by the defense. You can file your motion. You can preserve that for the record.

DEFENDANT: Thank you.

THE COURT: I wanted to make that statement as a matter of record and you can file that motion. Understanding what it is, I will respectfully deny it at this time.

* * *

13

THE COURT: That's fine. So the record should reflect that the defendant's motion to discharge the jury for removal of all black males - -

DEFENDANT: Right it. Was three on there. One I agreed for cause, the other two the State used their challenges on, is that correct?

MR. CLARK [Assistant State's Attorney]: I don't recall.

THE COURT: I was trying to be sure about the title of your motion. Motion to discharge jury panel is denied."

Defendant argues that the trial court denied him the opportunity to make a *prima facie* showing of discrimination as required by the first stage of the three-step Batson procedure. Defendant maintains that instead of following the proper procedure, the trial court relied on its own observations to make a judicial determination that the State had not engaged in any purposeful discrimination.

We disagree. It is true that the Batson procedure consists of three stages. However, a Batson claim will not proceed beyond the first stage if the movant does not make a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. This is exactly what occurred here. Defendant filed his written motion to discharge the jury on the basis that African-American men had been removed from the jury by the State. The bare-bones motion did not contain any specific facts to support the allegation of discrimination. To make it beyond stage one, defendant must produce evidence sufficient to permit the trial court to draw an inference that discrimination had occurred. Defendant's motion was inadequate to

make a *prima facie* showing of discrimination.  Additionally, the part of the report of proceedings that briefly discussed the motion did not contain any specific facts that would support an inference that discrimination had occurred.

We are not persuaded by defendant's reliance on Hogan or People v. Davis, 231 Ill. App. 3d 349 (2008) (Davis I).  In Hogan, this court reversed and remanded the cause for a new trial because it determined that the trial court had not followed the three-step Batson procedure when it did not allow defense counsel the opportunity to make a *prima facie* showing of discrimination before it proceeded to the State's reasons for excluding the juror and ultimately making its ruling.  Hogan, 389 Ill. App. 3d at 101-02.  In Davis I, this court reversed and remanded the cause for a Batson hearing because the trial court collapsed the three-step Batson procedure into one step when it considered only whether the State could offer a race-neutral explanation for striking a juror.  Davis I, 231 Ill. 2d at 368-69.

Hogan and Davis I make clear that when there is a Batson objection, the trial court must allow the defendant the opportunity to make a *prima facie* showing of discrimination before the court determines whether it is necessary to proceed to the second and third stages.  Here, however, as stated above, defendant's Batson objection occurred after *voir dire* proceedings and was made in the context of a written motion that was devoid of any specific facts.  Therefore, we find that defendant was provided with an opportunity to make a *prima facie* showing of discrimination (in his motion), but fell woefully short.  We conclude the trial court properly found that

15

defendant did not present a *prima facie* case of a <u>Batson</u> violation and thus the trial court's analysis properly ended at the first stage. Under these circumstances, the trial court's denial of defendant's motion was not clearly erroneous.

### *Pro Se* Representation

Next, defendant contends the trial court should not have permitted him to represent himself *pro se* because he was not mentally competent to do so. Defendant argues that although he was found mentally competent to stand trial, he was not mentally competent to conduct his own defense.

Defendant relies on the Supreme Court opinion of <u>Indiana v. Edwards</u>, 554 U.S. ___, 171 L. Ed. 2d 345, 128 S. Ct. 2379 (2008). Defendant argues that <u>Edwards</u> stands for the proposition that the federal constitution allows for a higher standard than just basic fitness when the defendant chooses to represent himself. Defendant maintains that the trial court should have conducted a separate inquiry or hearing as to whether he was competent to proceed *pro se*.

The issue in <u>Edwards</u> concerned a criminal defendant whom a state court found mentally competent to stand trial if represented by counsel but not mentally competent to represent himself *pro se* at trial. The Supreme Court considered whether under these circumstances the Constitution forbade a state from insisting that the defendant proceed to trial with counsel, thereby denying the defendant the right to represent himself. The Court found that it was constitutional for a state to deny the defendant the right to represent himself if the defendant was not mentally competent to do so.

Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 351, 128 S. Ct. at 2382. In reaching this determination, the Court noted its "foundational 'self-representation' case" of Faretta v. California, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), which held that the sixth and fourteenth amendments include a constitutional right to proceed without counsel when a criminal defendant voluntarily and intelligently elects to do so. Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 352-53, 128 S. Ct. at 2383. However, the Court made clear that Faretta did not answer the question presented in Edwards because Faretta did not concern a defendant with mental competency issues, or what is sometimes called a "gray-area" defendant. The Court reiterated that the question in Edwards concerned whether there was a mental-illness-related limitation on the scope of the right of self-representation. Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 353, 128 S. Ct. at 2384. In finding that it was constitutional to limit this right, the Court reasoned that an individual may well be able to satisfy the mental competence standard to stand trial when represented by counsel, yet may be unable to carry out the basic tasks needed to present his own defense without the help of counsel. Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 355, 128 S. Ct. at 2386. The Court also noted that "mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant. [Citation.]" Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 356, 128 S. Ct. at 2387. The Court additionally noted that, "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense

17

without the assistance of counsel. [Citation.]" Edwards, 554 U.S. at ___, 171 L. Ed. 2d at 356, 128 S. Ct. at 2387.

Initially, we note that despite defendant's contention, Edwards did not hold there was a higher standard of competence requiring an additional inquiry before a trial court permitted a defendant to proceed *pro se*. Rather, Edwards simply held that a defendant's right to self-representation was not absolute and could be limited if a defendant was not mentally competent to proceed *pro se*, yet was still competent to stand trial with representation.

Defendant maintains that his behavior throughout trial indicated that he was not mentally competent to proceed *pro se*. He points to his "bizarre" theory of the case that concerned his family members, a real-estate trust, his mother's guardianship proceedings and his criminal allegations regarding Claude W. Allen, Jr.

Here, once defendant was found fit to stand trial, the trial court allowed him to proceed *pro se* based on his repeated requests to allow his public defender to withdraw. The court noted that defendant was intelligent and capable of conducting his own defense. Defendant performed all of the duties that an attorney would do, including making an opening statement and closing argument, cross-examining witnesses, entering exhibits into evidence, objecting to witnesses' testimony and submitting jury instructions. The record does show obvious deficiencies in defendant's self-representation as a result of defendant not being an attorney. However, these deficiencies were not the result of mental incompetence. Defendant was able to carry

18

out the basic tasks needed to present his own defense without the help of counsel.  We heed the direction of the Court in Edwards that a "gray-area" defendant may be fit to stand trial, yet not fit to play the significantly expanded role required of self-representation.  However, this defendant does not fit within that characterization.

Further, defendant's argument on this issue invites this court to substitute its judgment for that of the trial court regarding whether he was mentally competent to proceed *pro se*.  His reliance on Edwards in advancing his argument is misplaced.  Nothing in Edwards requires a trial court to do what defendant now argues should have been done, i.e. the forced denial by the trial court of defendant's right to proceed *pro se* although he was found mentally competent to stand trial.  The record establishes that the defendant was articulate when he engaged in discussion with the trial court and the prosecutor during the proceedings.  In fact, two trial judges had clearly given much attention to the issue of defendant's mental ability to represent himself.  Defendant went to great lengths to convince the trial court that he was mentally fit to proceed *pro se*. The trial court engaged in exchanges with defendant that outlined the difficulties inherent in *pro se* representation.  Yet, the defendant remained adamant in his desire to discharge his defense attorney and proceed *pro se*.  The discussions between defendant and the trial court show articulate, clear, verbal exchanges.  Subsequently, the trial court had a final, extensive, and articulate exchange with defendant. Defendant outlined his educational background and assured the trial court that he understood and accepted the perils of *pro se* representation.  The exchange ended with

the following:

"DEFENDANT: Judge Hill if you give me a fair trial, I feel confident justice will be served.

THE COURT: All right. The court finds that the defendant has knowingly and intelligently made the decision to represent himself in this jury trial."

Defendant's argument suggests that Edwards required the trial judge to apply a higher standard than that required to determine mental fitness to stand trial, since he was proceeding *pro se*. Edwards establishes no such requirement. The defendant having used all of his skill and capacity to convince the trial court of his mental fitness, cannot now say that the court should have looked beyond the information it was provided and somehow discern unfitness to proceed *pro se*. There is no support in Edwards for such a theory. The trial judge conducted the matter appropriately based on the information before the court.

Moreover, we disagree with defendant's characterization of his defense theory as "bizarre." We view it more as his poor choice to pursue a defense that the evidence did not support. Defendant consistently maintained that he stabbed his sister in defense of his mother. However, because defendant did not understand the legal concept of self-defense, much of the evidence he sought to admit at trial was deemed irrelevant. The court even rejected defendant's proposed jury instruction on self-defense because defendant had not presented sufficient evidence at trial to warrant a self-defense instruction. Defendant was misguided by his own choices, not his lack of mental

competence. We find no error in the court permitting defendant to represent himself.

Waiver of Counsel

Next, defendant contends his waiver of counsel at trial was invalid. He argues that because the trial court misled him on several occasions regarding his ability to properly issue subpoenas, his waiver of counsel was not knowing and voluntary. Specifically, defendant maintains that because he sent his subpoenas by mail, which Judge Sumner advised defendant he could do, they had no legal effect because doing so violated Cook County Circuit Court Rule 15.3(b), which provides that a subpoena may not be served by a party.

Cook County Circuit Court Rule 15.3(b) provides in part:

"A subpoena may be served by the sheriff, by his deputy or by any person over 21 years of age and not a party. Service of a subpoena shall be made by delivering a copy thereof to the person named." Cook Co. Cir. Ct. R. 15.3(b).

Defendant points out that as a result of the court's misinformation, none of the witnesses he subpoenaed showed up at trial, which left him with no witnesses or evidence at trial other than his own testimony.

The State responds that defendant's service of subpoenas by mail was proper because Rule 15.3(b) merely sets forth who may serve a subpoena and to whom the subpoena should be delivered. It maintains that the rule does not support defendant's position that serving a subpoena by mail has no legal effect.

21

Here, regardless whether the court's statements regarding defendant's subpoenas were misleading, defendant, acting as his own attorney, must comply with the rules of procedure required of attorneys, and a court will not apply a more lenient standard to *pro se* litigants. People v. Fowler, 222 Ill. App. 3d 157, 163 (1991). Defendant was admonished about the consequences of proceeding *pro se* and that he would be required to perform as an attorney would and the court could not provide any legal assistance to him. Defendant informed the court that he fully understood the court's admonitions and that he wanted to proceed *pro se*. Thus, defendant complains of a situation entirely of his own making. It is well settled that a defendant may not be heard to complain of errors that he injected into his own trial. People v. Scott, 148 Ill. 2d 479, 531 (1992). We find that any statement the trial court made regarding subpoenas did not act to nullify defendant's waiver of counsel.

Opening Statement and Closing Argument

Next, defendant contends the State's comments in its opening statement and closing argument denied him a fair trial because the State commented on his right to proceed *pro se*. Defendant argues that the State repeatedly invoked the theme of "control" to explain why defendant stabbed the victim and why he chose to represent himself, which denied him a fair trial because defendant's assertion of his constitutional right to represent himself cannot be used as evidence of guilt in a criminal trial.

Defendant points to the State's following comments in its opening statement.

"The defendant who sits before you today, he likes control. He likes to

22

control the situation.  That's part of the reason he's sitting their [*sic*] alone today.

* * *

This defendant on August 7th of 2004 resented the fact that he had no control over the situation with his mother and Debbie Whitebear. Debbie Whitebear was the obstacle at that point on that day between him and his mother.  And his way to get control of that situation was to take her out, and that's what he did.  He committed the offense of first degree murder."

Defendant points to the State's following comments in its closing argument. "The reason why we have been in this courtroom for the past four days is the defendant's insatiable appetite for control over his sick mother, her property, and his sibling rivalry, and his perception that his siblings were being favored or treated differently than he was.  Him being treated unfavorably as opposed to his two sisters.  That is essentially what has motivated this defendant to take the life of Debbie Allen Whitebear.

* * *

And he again asserted control over the situation taking the life of Debbie Allen Whitebear.  He controlled the situation, he seized control of that situation by bursting into that house and plunging a knife into the chest of Debbie Allen Whitebear.  He seized control of his own defense by

23

sitting alone at that table. But when you retire to the jury room, he is not in control of your verdict. You control that. And you can control the fact that you can bring defendant to justice for the killing of Debbie Allen Whitebear by finding him guilty of first degree murder on all counts."

The character and scope of an attorney's opening and closing arguments are left to the trial court's discretion, and prosecutors are afforded wide latitude in their closing arguments. People v. Ellis, 315 Ill. App. 3d 1108, 1121 (2000). Prosecutors may comment on the relevant evidence as well as any fair and reasonable inferences therefrom. People v. Nicholas, 218 Ill. 2d 104, 121 (2005). A prosecutor's remarks will not warrant a new trial unless they are so prejudicial to the defendant that, absent those remarks, there is doubt as to whether the jury would have rendered a guilty verdict. People v. Nieves, 193 Ill. 2d 513, 532-33 (2000). When our consideration implicates the legal question of whether a prosecutor's comments warrant a new trial, our review is de novo. People v. Wheeler, 226 Ill. 2d 92, 121 (2007).

Defendant argues that the State's continued emphasis on his desire for control was improper as it related to his constitutional right to represent himself at trial.

Here, we find no error in the State's comments. The State's comments simply acknowledged that defendant was "sitting alone" at the defense table. The State did not go in any details about defendant's pro se representation and did not ask the jury to draw any negative inferences from that representation. The State's additional comments that defendant stabbed the decedent because of his desire for control was a

fair inference from the evidence presented at trial. We do not find that but for the State's remarks, the verdict would have been any different. Further, we reject defendant's contention that we should equate the State's acknowledgment of defendant representing himself with a prosecutor's comment on a defendant's failure to testify at trial.

General Verdict Form

Lastly, defendant contends he was denied a fair trial because a general verdict form was used rather than separate verdict forms for the various theories of first-degree murder with which defendant was charged. Defendant argues that because a general verdict form was used, the jury's verdict did not reflect whether it found him guilty of intentional murder, knowing murder or felony murder. He maintains that if the jury found him guilty of felony murder, such a finding would have precluded the trial court from sentencing him to consecutive terms of imprisonment for murder and the underlying felony of home invasion. Defendant argues that we should vacate the conviction and sentence for home invasion.

The offense of first-degree murder is defined as:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

25

(2) he knows that such acts crate a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder."  720 ILCS 5/9-1(a) (West 2006).

In Illinois, it is clear that, where a general murder verdict is delivered for a defendant who is charged with murder in multiple counts alleging intentional, knowing, and felony murder, the defendant is presumed to be convicted of the most serious offense of intentional murder, and judgment and sentence should be entered on that count.  People v. Braboy, 393 Ill. App. 3d 100, 107 (2009).  However, when a defendant who is charged with intentional or knowing murder and felony murder requests a separate verdict form for felony murder and such a request has a basis in the evidence presented at trial, the separate verdict form must be given or consecutive sentences cannot be imposed based on the offense underlying the felony murder.  People v. Smith, 233 Ill. 2d 1, 10 (2009); see also People v. Battle, 393 Ill. App. 3d 302, 313 (2009) (when a defendant requests separate verdict forms for the separate theories of murder, and the request is denied, the general verdict form must be interpreted as a finding of guilty of felony murder and the defendant cannot be convicted of the underlying felony).

Here, defendant did not request separate verdict forms.  Therefore, Smith is inapplicable since Smith is limited to situations in which the trial court actually denied a request for separate verdict forms.  Braboy, 393 Ill. App. 3d at 108.  As such, defendant

is presumed guilty of the most serious offense of intentional murder and the trial court's judgment and sentence was proper.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

CUNNINGHAM, P.J, and HOFFMAN, J., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

RODERICK T. ALLEN,

Defendant-Appellant.

No. 1-08-0354

Appellate Court of Illinois
First District, Second Division

May 25, 2010

JUSTICE KARNEZIS delivered the opinion of the court.

CUNNINGHAM, P.J. and HOFFMAN, J., concur.

Appeal from the Circuit Court of Cook County.

The Honorable Arthur F. Hill, Jr., Judge Presiding.

For APPELLANT, Michael J. Pelletier, State Appellate Defender, Patricia Unsinn, Deputy Defender (Katherine M. Donahoe, Assistant Appellate Defender, of counsel)

For APPELLEE, Anita Alvarez, State's Attorney of Cook County (James E. Fitzgerald, Ashley A. Romito, Jessica R. Ball, Assistant State's Attorneys, of counsel)