# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Fleming v. Moswin*, 2012 IL App (1st) 103475-B

---

| | |
|---|---|
| Appellate Court Caption | LAURENSA FLEMING and LORENZO WEAVER, Special Co-Administrators of the Estate of Lawrence Fleming, Jr., Deceased, Plaintiffs-Appellants, v. ARTHUR MOSWIN, HYDE PARK ASSOCIATES IN MEDICINE, LTD., a Corporation, and MARK SCHACHT, Defendants-Appellees (Roberto Ramirez, Defendant). |
| District & No. | First District, First Division<br>Docket No. 1-10-3475 |
| Modified opinion filed upon denial of rehearing | August 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a judgment for defendants in an action alleging negligence in the diagnosis of decedent's bladder cancer, plaintiffs failed to establish a *prima facie* violation of *Batson,* and plaintiffs failed to show they were entitled to a new trial based on the admission of evidence in violation of the Dead-Man's Act and the hearsay rule. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-5802; the Hon. Edward Washington, II, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

Counsel on Appeal

Margaret M. O'Leary, of Chicago, for appellants.

Lowis & Gellen, LLP, of Chicago (Deborah M.R. O'Brien, Michael A. Code, and Jamie A. Leavitt, of counsel), for appellees Arthur Moswin and Hyde Park Associates in Medicine, Ltd.

Pretzel & Stouffer, Chtrd., of Chicago (Robert Marc Chemers, Brian T. Henry, and Christine J. Iversen, of counsel), for appellee Mark Schacht.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Justice Karnezis concurred in the judgment and opinion.

Justice Hall dissented, with opinion.

## OPINION

¶ 1     This matter is now before this court for the second time. Plaintiffs-appellants, Laurensa Fleming and Lorenzo Weaver, special co-administrators of the estate of Lawrence Fleming, Jr., deceased, initially brought this medical malpractice action to recover damages following decedent's death of bladder cancer in 2004. A directed verdict was entered in favor of defendant Roberto Ramirez, M.D, and–following a jury trial–judgment was entered in favor of defendants-appellants, Arthur Moswin, M.D., his employer, Hyde Park Associates in Medicine, Ltd., a corporation (collectively, Dr. Moswin), and Mark Schacht, M.D. Plaintiffs appealed, contending that the trial court improperly denied their posttrial motion for a new trial because: (1) Dr. Schacht exercised a peremptory challenge against a prospective juror in violation of the principles espoused in *Batson v. Kentucky*, 476 U.S. 79 (1986); and (2) evidence was admitted at trial in violation of both the Dead-Man's Act (735 ILCS 5/8-201 (West 2008)) and the general rule against hearsay.

¶ 2     In our original order, we found that there had been an apparent failure on the part of the trial court to conduct a proper *Batson* analysis. *Fleming v. Moswin*, 2012 IL App (1st) 103475-U. We, therefore, retained jurisdiction over this appeal and remanded this matter to the trial court for the limited purpose of allowing the trial court to conduct a proper *Batson* analysis and to file amended findings of fact and conclusions of law with this court. *Id.* ¶¶ 45-46. Pursuant to that order, the trial court has now filed an "Order on Remand" in which it found that a *Batson* violation did indeed occur during jury selection and, therefore, plaintiffs' motion for a new trial should now be granted. Additionally, all parties on appeal have also filed supplemental briefs in accordance with our prior order. *Id.*

¶ 3     For the following reasons, we affirm the trial court's initial denial of plaintiffs' posttrial

motion for a new trial.

¶ 4                                       I. BACKGROUND

¶ 5        Because some of the relevant factual background was fully set out in our prior order (*Fleming*, 2012 IL App (1st) 103475-U, ¶¶ 4-17), we recite here only those facts necessary for our consideration of the matters now pending before this court.

¶ 6        In their pleadings, plaintiffs generally alleged that the named defendants were involved in the evaluation and treatment of decedent's complaints of a host of urinary difficulties and related issues throughout 2002 and 2003. Plaintiffs alleged that as a result of various acts of negligence on the part of defendants, the diagnosis of decedent's bladder tumor was significantly delayed, and this delay contributed to decedent's death from metastatic bladder cancer in August of 2004.

¶ 7        The parties' discovery disclosures reveal additional detail about the issues and evidence to be presented at trial. Plaintiffs intended to present evidence, including expert opinions, establishing that decedent was evaluated by an internist, Dr. Moswin, in 2002 for complaints of urinary frequency and blood in his urine, but Dr. Moswin improperly failed to refer decedent to a urologist for more specialized care. They would also attempt to establish that decedent was, ultimately, evaluated and treated in 2003 by a urologist, Dr. Schacht. However, Dr. Schacht violated the standard of care by–among other things–failing to have decedent undergo a cystoscopy to determine the cause of his symptoms. Finally, plaintiffs would produce evidence that decedent's new internist, Dr. Ramirez, failed to properly coordinate the decedent's care with Dr. Schacht in 2003. As a result of all these failures, decedent's bladder cancer was not discovered until another doctor finally ordered a cystoscopy in late 2004.

¶ 8        In turn, defendants would provide evidence and expert opinions refuting plaintiffs' contentions. Of particular relevance here, Dr. Schacht was expected to present a defense which included evidence that he repeatedly offered to perform a cystoscopy throughout 2003, but decedent consistently refused.

¶ 9        The matter proceeded to a jury trial in December of 2009. Prior to trial, the trial court addressed a number of motions *in limine* filed by the parties. These included plaintiffs' motion to bar or limit certain testimony regarding Dr. Schacht's care of the decedent.[1] Specifically, plaintiffs indicated that they intended to present evidence regarding Dr. Schacht's failure to order a cystoscopy on any of the many occasions he evaluated or treated decedent between March and November of 2003. They also intended to offer expert opinions that each of these failures constituted a violation of the standard of care, and that the delay in performing this procedure contributed to decedent's death in 2004. However, plaintiffs contended that Dr. Schacht should not be permitted to testify regarding any conversations he had with decedent on these occasions–including any conversations where decedent

_____

[1]The actual written motion *in limine* is not contained in the record on appeal. Thus, our discussion of this motion is guided by those portions of the transcript where this motion was discussed by the parties and the trial court.

purportedly refused a cystoscopy–because such conversations were inadmissible pursuant to the Dead-Man's Act. See 735 ILCS 5/8-201 (West 2008) ("In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability ***.").

¶ 10        Dr. Schacht challenged plaintiffs' motion. He contended that by indicating their intent to offer evidence and opinions regarding each of his meetings with decedent, plaintiffs were necessarily also indicating a waiver of the protections of the Dead-Man's Act by implicating a statutory exception contained therein. See 735 ILCS 5/8-201(a) (West 2008) ("If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event."). Dr. Schacht further cited to a number of opinions applying this exception in similar circumstances. See *Hoem v. Zia*, 159 Ill. 2d 193, 201-02 (1994) (applying this exception in a medical malpractice action where plaintiff estate introduced evidence of decedent's interactions with defendant doctor, as allowing the estate to do so without allowing the defendant doctor the opportunity to give his version of events "would not advance the policy behind the Act"); *Malanowski v. Jabamoni*, 332 Ill. App. 3d 8, 13 (2002) (same).

¶ 11        After extensive discussion of this motion, the trial court indicated that the exception would apply at trial. Dr. Schacht would, therefore, be allowed to refute plaintiffs' assertions by testifying about his conversations with decedent if plaintiffs first "opened the door" by introducing evidence regarding the specific occasions when those conversations took place.

¶ 12        The matter proceeded to a jury trial in December of 2009. Jury selection for the trial began with each side being given seven peremptory challenges, with an additional challenge awarded to each side for use in selecting alternate jurors. The defense side split their seven challenges, with four challenges awarded to Dr. Moswin and three challenges awarded to Dr. Schacht. Dr. Schacht used two of his three challenges and, on both occasions, he excused African-Americans. Specifically, Dr. Schacht excused juror No. 13, Ian Okosi, and juror No. 21, Betty Riley. Following Dr. Schacht's challenge to Ms. Riley, plaintiffs raised a *Batson* challenge to Dr. Schacht's use of peremptory challenges.

¶ 13        The trial court rejected plaintiffs' *Batson* challenge, and the jury, ultimately, included three African-American jurors with an additional two Caucasian jurors serving as alternates.

¶ 14        After the jury was selected, plaintiffs again raised the issue of Dr. Schacht's testimony regarding his conversations with decedent. Plaintiffs argued that defendants should not be able to argue in opening statements that decedent did not consent to a cystoscopy because no testimony had yet been heard, and the exception contained in the Dead-Man's Act had, therefore, not yet been implicated.

¶ 15        In the context of making this argument, plaintiffs indicated that they were now going to limit their evidence against Dr. Schacht to a single claim that he violated the standard of care

-4-

by failing to order a cystoscopy the very first time he evaluated decedent in March of 2003. It was uncontested that Dr. Schacht did not recommend, and decedent did not reject, such a procedure on that date. Because plaintiffs would not introduce any evidence regarding Dr. Schacht's subsequent interactions with decedent, plaintiffs, therefore, asserted that the trial court's prior ruling on their motion *in limine* was no longer applicable. Thus, Dr. Schacht should be barred from introducing any evidence of his subsequent conversations with decedent at trial and should not be permitted to reference such conversations in opening statements.

¶ 16    The trial court rejected this argument. The trial court reasoned that because plaintiffs were seeking to hold Dr. Schacht accountable for the entire delay in performing the cystoscopy from March to November of 2003, they had sufficiently opened the door to allow Dr. Schacht to offer his explanation for that delay. Another separate oral motion to bar Dr. Schacht's testimony regarding decedent's refusal to consent to a cystoscopy on the grounds that such statements were inadmissible hearsay was, subsequently, denied.

¶ 17    At trial, the evidence largely mirrored the allegations and defenses noted above. Notably, plaintiffs' examination of their own expert during their case-in-chief included questioning regarding a number of Dr. Schacht's interactions with decedent in 2003. Plaintiffs' expert opined that Dr. Schacht had violated the standard of care by failing to perform a cystoscopy on any of those occasions, even if decedent had expressed reservations about undergoing the procedure. Dr. Schacht, in defense, testified regarding his recommendations that a cystoscopy be performed and decedent's repeated refusal to consent to such a procedure. The jury, ultimately, returned a verdict in favor of defendants.

¶ 18    The trial court, subsequently, denied plaintiffs' posttrial motion for a new trial. In that motion, plaintiffs reasserted that the trial court had improperly denied their allegations of a *Batson* violation with respect to Dr. Schacht's use of peremptory challenges and, also, reasserted the evidentiary challenges raised both before and during trial. With respect to plaintiffs' *Batson* challenge to the exclusion of Ms. Riley, the trial court concluded: "After reflecting on the matter, the Court finds that the Plaintiff made a *prima facie* case under *Batson* with respect to Ms. Riley #21. The defendant failed to provide a race-neutral explanation for excluding Ms. Riley by the manifest weight of the evidence ***." However, the trial court then went on to further consider whether plaintiffs had met their burden to establish purposeful discrimination. As part of that discussion, the trial court noted: (1) three African-American jurors were, ultimately, accepted and served on the jury, a proportion similar to the proportion of African-Americans on the overall venire; (2) peremptory challenges to potential African-American jurors were exercised nonconsecutively, with African-American jurors accepted on to the jury both before and after such challenges; and (3) Dr. Schacht had a peremptory challenge that was left unused and was, thus, not used to strike additional African-American members of the venire. The trial court, ultimately, found "no purposeful discrimination occurred," explaining:

    "Considering the totality of the circumstances, including the racial makeup of the resulting jury, the Court rules that the Plaintiff's [*sic*] received a fair trial, and that no retrial is required under *Batson*. The Plaintiff[s] failed to meet the ultimate burden of establishing a pattern [of] purposeful discrimination. Accordingly, there was no error,

and Plaintiffs' motion for a new trial on this should be denied."

¶ 19    With respect to Dr. Schacht's testimony, the trial court again rejected plaintiffs' contentions regarding the Dead-Man's Act. Specifically, the trial court reasoned that the evidence presented by plaintiffs indicating that "Dr. Schacht breached his standard of care raises the inference that no cystoscopy was recommended, thereby opening the door for Dr. Schacht's testimony on this particular subject."

¶ 20    Plaintiffs, subsequently, appealed the denial of their posttrial motion to this court, although their arguments on appeal were limited to their Dead-Man's Act and hearsay evidentiary challenges and an assertion that there was a *Batson* violation with respect to Dr. Schacht's use of a peremptory challenge against Ms. Riley.

¶ 21    In our prior order, our discussion was limited to plaintiffs' *Batson* argument. *Fleming*, 2012 IL App (1st) 103475-U, ¶ 23. We acknowledged that "in addressing a *Batson* challenge, the trial court must follow a 'methodical three-step approach' " (*id*. ¶ 33 (quoting *People v. Davis*, 233 Ill. 2d 244, 249 (2009) (*Davis II*))) and, we further noted, "a number of ways in which the trial court's consideration of plaintiffs' *Batson* challenge to the exclusion of Ms. Riley from the jury failed to properly follow the specific, three-step analysis" required (*id*. ¶ 35). We, thus, found that "[w]here there has been an apparent failure to conduct the proper *Batson* analysis, we are required to 'remand this cause to the trial court for an expedited hearing for the limited purpose of allowing the trial court to conduct the proper *Batson* analysis.' " *Id*. ¶ 45 (quoting *People v. Martinez*, 317 Ill. App. 3d 1040, 1046 (2000)). Therefore, we declined to address plaintiffs' evidentiary challenges, remanded for a proper *Batson* analysis as to the challenge to Ms. Riley, instructed the trial court to file amended findings of fact and conclusions of law on that issue with this court, and retained jurisdiction over this matter to address all pending matters following the proceedings on remand. *Id*. ¶¶ 45-46.

¶ 22    The trial court, subsequently, filed a 21-page "Order on Remand" with this court. In that order, the trial court noted that we remanded for further consideration of the *Batson* issue because we had concluded that the trial court may initially have "incorrectly condensed and fused the three separate steps of the *Batson* analysis." The trial court also recognized that we had expressed a concern that the trial court may have originally found that an improper exclusion of Ms. Riley would not require a new trial so long as other evidence–including the racial composition of the members of the venire actually selected to serve on the jury–indicated plaintiffs had received a fair trial. The trial court, thereafter, proceeded to conduct an amended, delineated, three-step *Batson* analysis. At the conclusion of that analysis, the trial court found that the "circumstances of the proceedings establish that Ms. Riley was excluded on the basis of race in violation of *Batson*," and "[t]herefore, plaintiffs' motion for a new trial is granted." The parties, thereafter, filed supplemental briefs with this court addressing the trial court's order on remand, and the matter again stands ready for our further consideration.

¶ 23                                    II. ANALYSIS

¶ 24    We now turn to the three issues presently facing this court in light of the trial court's

amended findings of fact and conclusions of law. These issues include: (1) plaintiffs' assertion that this appeal is now moot; (2) the propriety of the trial court's amended finding that a *Batson* violation did indeed occur in this matter; and (3) the Dead-Man's Act and hearsay issues left unaddressed in our original order.

¶ 25                                    A. Mootness

¶ 26    Plaintiffs note in their supplemental brief that upon remand, the trial court reversed its original ruling denying their motion for a new trial and concluded that–in light of its amended finding that a *Batson* violation had, in fact, occurred with respect to the peremptory challenge to Ms. Riley–"plaintiffs' motion for a new trial is hereby granted." Plaintiffs contend that because they have now received all of the relief they initially sought in filing this appeal, no actual controversy remains, this appeal is moot, and this court should dismiss their appeal and remand the matter to the trial court for a new trial.

¶ 27    " 'An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party.' [Citation.] Generally, courts of review do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. [Citation.]" *In re Jonathan P.*, 399 Ill. App. 3d 396, 400 (2010). As such, if this appeal were truly rendered moot by the trial court's decision to grant plaintiffs a new trial in its order on remand, we would indeed decline to address any issues now pending on appeal–unless certain inapplicable exceptions to the mootness doctrine applied here. *Id*. We find that this appeal is not moot, however, because the trial court did not have the authority to grant plaintiffs a new trial upon remand.

¶ 28    It is well recognized that "a reviewing court's mandate vests a trial court with jurisdiction only to take action that complies with the reviewing court's mandate. [Citation.] A trial court lacks the authority to exceed the scope of the mandate, and must obey precise and unambiguous directions on remand. [Citation.]" *People v. Winters*, 349 Ill. App. 3d 747, 749 (2004). Furthermore, "[t]he correctness of the trial court's action on remand is to be determined from the appellate court's mandate, as opposed to the appellate court opinion. [Citations.] However, if the direction is to proceed in conformity with the opinion, then, of course, the content of the opinion is significant. [Citations.]" *PSL Realty Co. v. Granite Investment Co.*, 86 Ill. 2d 291, 308 (1981). Additionally, "[i]f specific directions are not given, *** then the lower court should examine the opinion and determine what further proceedings would be consistent with the opinion." *People ex rel. Bernardi v. City of Highland Park*, 225 Ill. App. 3d 477, 482 (1992). Finally, "[a]ny other order issued by the trial court is outside the scope of its authority and void for a lack of jurisdiction." *Id*. at 481.

¶ 29    Here, the mandate issued following our initial order contained no specific instructions and, therefore, both this court and the trial court look to our prior order to determine the scope of the trial court's authority on remand. In that order, we stated:

> "Where there has been an apparent failure to conduct the proper *Batson* analysis, we are required to 'remand this cause to the trial court for an expedited hearing for the

limited purpose of allowing the trial court to conduct the proper *Batson* analysis ***.' [Citation.] This three-step analysis should be limited solely to a consideration of the peremptory challenge to Ms. Riley, as this is the only *Batson* challenge plaintiffs have raised on appeal. Moreover, the trial court need not conduct an evidentiary hearing on the matter, but, rather, should make complete findings of fact and conclusions of law–consistent with this order–'on the record as it now exists.' [Citation.] Because we are remanding for further *Batson* proceedings, ' " 'the correct procedure' is for this court to withhold disposition of other unrelated issues, retaining jurisdiction to consider them after the *Batson* proceedings." ' [Citation.] We, therefore, do not consider the evidentiary challenges plaintiffs have raised on appeal at this time.

The trial court shall file findings of fact and conclusions of law on remand, together with any record of the proceedings, with the clerk of this court within 60 days of the issuance of the mandate in this matter. [Citation.] Within 14 days following the filing of these materials with this court, plaintiffs may submit to this court a supplemental brief solely addressing this issue. Defendants shall each have 14 days thereafter to file any response, and no further briefs shall be entertained without further order of this court. This court will thereafter issue a final judgement on all issues pending at that time." *Fleming*, 2012 IL App (1st) 103475-U, ¶¶ 45-46.

We then concluded by stating: "we retain jurisdiction over this matter, but remand this cause to the circuit court of Cook County for proceedings consistent with this order." *Id.* ¶ 48.

¶ 30    As our prior order made clear, we remanded this matter to the trial court for a narrow purpose, *i.e.*, to conduct a proper *Batson* analysis and to make findings of fact and conclusions of law with respect to that issue. We, otherwise, specifically *retained jurisdiction*, and our order clearly contemplated that this matter would return to this court for further consideration after both the trial court's order on remand and the parties' supplemental briefs had been filed. Our further consideration would include a final ruling on plaintiffs' motion for a new trial, a ruling that would be made in light of the trial court's amended *Batson* analysis and the Dead-Man's Act and hearsay issues we specifically declined to address in our prior order.

¶ 31    We certainly understand that the trial court merely followed the findings and conclusions contained in its amended *Batson* analysis to their natural conclusion when it granted plaintiffs' motion for a new trial. However, we did not remand this matter to the trial court for a final ruling on plaintiffs' motion for a new trial, and that portion of the trial court's order on remand which granted that motion was, therefore, "outside the scope of its authority and void for a lack of jurisdiction." *City of Highland Park*, 225 Ill. App. 3d at 481. As such, the original denial of plaintiff's motion for a new trial still stands, and that decision must still be evaluated by this court in light of the trial court's amended findings and conclusions on the *Batson* issue. The trial court's order on remand, thus, did not grant plaintiffs all the relief they have sought, and this appeal has, therefore, not been rendered moot.

¶ 32                        B. Amended *Batson* Findings

¶ 33    We now consider the trial court's amended *Batson* analysis, as reflected in its order on

-8-

remand. Upon review, we find that the trial court improperly concluded that plaintiffs had established a *prima facie* case of discrimination in support of their *Batson* challenge.

¶ 34                        1. Legal Framework and Standard of Review

¶ 35    As we discussed at length in our original order, "[i]n *Batson*, the United States Supreme Court held that, in a criminal case, the fourteenth amendment's equal protection clause prohibits a prosecutor from using a peremptory challenge to exclude a prospective juror solely on the basis of his or her race." *Mack v. Anderson*, 371 Ill. App. 3d 36, 43 (2006) (citing *Batson*, 476 U.S. at 89). This rule was extended in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991), wherein the Court held: "courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial." *Edmonson*, 500 U.S. at 630. In addressing a *Batson* challenge, the trial court must follow a "methodical three-step approach." *Davis II*, 233 Ill. 2d at 249. Specifically, this court has recognized:

> "First, the moving party must meet his burden of making a *prima facie* showing that the nonmoving party exercised its peremptory challenge on the basis of race. [Citations.] If a *prima facie* case is made, the process moves to the second step, where the burden then shifts to the nonmoving party to articulate a race-neutral explanation for excusing the venireperson. [Citations.] Once the nonmoving party articulates its reasons for excusing the venireperson in question, the process moves to the third step, where the trial court must determine whether the moving party has carried his burden of establishing purposeful discrimination. [Citations.] At the third step, the trial court evaluates the reasons provided by the nonmoving party as well as claims by the moving party that the proffered reasons are pretextual. [Citations.]" *Mack*, 371 Ill. App. 3d at 44.

¶ 36    The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *People v. Davis*, 231 Ill. 2d 349, 363 (2008) (*Davis I*). A trial court's ultimate finding, as to whether purposeful discrimination has been proved, is a finding of fact, and that finding will not be overturned unless it is found to be clearly erroneous. *Mack*, 371 Ill. App. 3d at 46. A finding is clearly erroneous where the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *LeCompte v. Zoning Board of Appeals*, 2011 IL App (1st) 100423, ¶ 16.

¶ 37                        2. Analysis of the Trial Court's Findings

¶ 38    Upon remand, the trial court conducted an amended, delineated, three-step *Batson* analysis and detailed its findings and conclusions of law in a written order. The trial court first addressed the question of whether plaintiffs met their initial burden of establishing a *prima facie* case of discrimination.

¶ 39    Before reviewing the trial court's analysis of plaintiffs' *prima facie* case of discrimination, we first address plaintiffs' contention that this issue should not be considered by this court because it is either moot pursuant to *Hernandez v. New York*, 500 U.S. 352, 359 (1991), or has been waived by defendants. We disagree.

¶ 40 With respect to plaintiffs' mootness argument, we note that in *Hernandez*, 500 U.S. at 359, the court considered a *Batson* challenge in the context of a criminal appeal and recognized that: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." This rule has subsequently been recognized and applied by our supreme court in both criminal and civil contexts. *People v. Mitchell*, 152 Ill. 2d 274, 289-90 (1992); *McDonnell v. McPartlin*, 192 Ill. 2d 505, 528 (2000).

¶ 41 However, our supreme court has more recently recognized that this rule is not absolute and cannot be "taken out of its original context." *People v. Rivera*, 221 Ill. 2d 481, 505-06 (2006) (*Rivera I*). Noting that this rule had previously been applied in situations where the trial court had made an ultimate ruling, rejected a *Batson* challenge, and found that the reasons for a peremptory challenge were valid and race-neutral, our supreme court went on to state:

> "Clearly, whether a *prima facie* case of discrimination exists at the outset becomes a moot point after the trial court finds valid and race-neutral reasons supporting the peremptory challenge and a court of review ultimately affirms that ruling. The party exercising a peremptory challenge suffers no prejudice in that instance because the juror in question is excused pursuant to that party's original challenge. The converse, however, is not true. Where a *prima facie* case does not exist, a party whose challenge is ultimately denied is prejudiced, because the matter should not have been advanced to the second step of the *Batson* process, and he should never have been compelled by the trial court to offer justification for his challenge in the first place. *** The burden of establishing a *prima facie* case of purposeful discrimination in jury selection is on the party making the *Batson* claim. [Citation.] It defies procedural logic that proof of a *prima facie* case could be insufficient to advance the *Batson* process to the second and third steps; yet, the party attempting to exercise its challenge could ultimately lose when the matter is erroneously advanced to the subsequent stages. Therefore, when a party is ultimately denied its right to exercise a peremptory challenge, we hold that matters bearing upon the first stage of the *Batson* process are properly within the scope of appellate review and not moot." (Emphasis omitted.) *Id*. at 506-07.

¶ 42 The trial court in this matter initially rejected plaintiffs' *Batson* challenge with respect to Ms. Riley, both during *voir dire* and in the context of ruling on plaintiffs' posttrial motion for a new trial. Plaintiffs appealed. Because the trial court had initially rejected plaintiffs' *Batson* challenge and made an ultimate ruling affirming Dr. Schacht's use of a peremptory challenge against Ms. Riley, the issue of a *prima facie* case of discrimination was arguably moot *at that time*. However, as discussed above, our original order found flaws with the trial court's entire *Batson* analysis and remanded for an amended, delineated, and proper "three-step" *Batson* analysis. *Fleming*, 2012 IL App (1st) 103475-U, ¶ 45.

¶ 43 When the trial court completed its amended analysis upon remand, it reversed its original position and made an ultimate ruling that "Ms. Riley was excluded on the basis of race in violation of *Batson*" and therefore Dr. Schacht's peremptory challenge should not have been allowed. As such, this court is now tasked with reviewing an order that effectively denies Dr.

Schacht his right to exercise a peremptory challenge with respect to Ms. Riley. As our supreme court has recognized, under such circumstances "matters bearing upon the first stage of the *Batson* process are properly within the scope of appellate review and not moot." *Rivera I*, 221 Ill. 2d at 507.

¶ 44 We also reject plaintiff's assertion that defendants have waived the issue of a *prima facie* case of discrimination. As an initial matter, we fundamentally disagree with plaintiffs' assertion that defendants waived the issue of a *prima facie* case because it was only raised in their original response briefs on appeal. Even if this were so, we note that defendants were originally in the position of defending the trial court's initial denial of plaintiffs' *Batson* challenge. It is well recognized that "[w]hile an appellant who fails to raise an issue in the trial court waives that issue, an appellee may raise an issue on review that was not presented to the trial court in order to sustain the judgment, as long as the factual basis for the issue was before the trial court." *DOD Technologies v. Mesirow Insurance Services, Inc.*, 381 Ill. App. 3d 1042, 1050 (2008). Furthermore, this court "can affirm the trial court on any basis that appears in the record, regardless of whether the trial court relied upon such ground or whether its rationale was correct." *Bowers v. State Farm Mutual Automobile Insurance Co.*, 403 Ill. App. 3d 173, 176 (2010).

¶ 45 More relevant, however, is the fact that this court is now in the position of reviewing the trial court's *amended Batson* analysis, as reflected in its order on remand. In response to that amended analysis–and pursuant to the express instructions contained in our prior order–defendants have each filed supplemental briefs in this court. In those briefs, both defendants make arguments with respect to the adequacy of plaintiffs demonstration of a *prima facie* case of discrimination. Thus, in no way have defendants waived any of their arguments as to the first step of the *Batson* analysis, and we therefore now turn to a discussion of that issue.

¶ 46 In order to establish a first-step *prima facie* case of purposeful discrimination in the exercise of Dr. Schacht's peremptory challenge to Ms. Riley, plaintiffs were required to present facts and any other relevant circumstances which raised an inference that Dr. Schacht challenged Ms. Riley because she was African-American. *Mack*, 371 Ill. App. 3d at 44 (citing *Batson*, 476 U.S. at 96). However, as defendants properly note in their briefs, the racial identity of the various trial participants alone will not establish a *prima facie* case of discrimination. Our supreme court has specifically indicated that "the mere fact of a peremptory challenge of a black venireperson who is the same race as defendant or the mere number of black venirepersons peremptorily challenged, without more, will not establish a *prima facie* case of discrimination." *Davis II*, 231 Ill. 2d at 361.

¶ 47 Thus, Illinois courts have recognized a general, nonexclusive list of factors relevant to determine whether a *prima facie* case of discrimination against African-American jurors has been established. These factors include: (1) the racial identity between the moving party and the excluded venireperson; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogenous

-11-

group sharing race as their only common characteristic; and (7) the race of the various parties and the witnesses. *People v. Allen*, 401 Ill. App. 3d 840, 848 (2010). The trial court may also utilize what is known as a "comparative juror analysis," whereby the striking party's questions to prospective jurors and the responses to those questions are evaluated, to see whether otherwise similar prospective jurors were treated differently because of their membership in a particular race. *Davis I*, 231 Ill. 2d at 361.

¶ 48    In sum, the trial court must consider the " 'totality of the relevant facts' " and " 'all relevant circumstances' " surrounding the peremptory strike to see if they give rise to an inference of a discriminatory purpose. *Id*. at 360 (quoting *Batson*, 476 U.S. at 93-94). "[T]he party asserting a *Batson* claim has the burden of proving a *prima facie* case and preserving the record, and any ambiguities in the record will be construed against that party." *Davis II*, 233 Ill. 2d at 262. Moreover, only if a *prima facie* case of purposeful racial discrimination has been demonstrated does the analysis continue to the next step. *Rivera I*, 221 Ill. 2d at 501-02. We apply a clearly erroneous standard of review to a trial court's determination of whether a *prima facie* case is demonstrated at the first step of the *Batson* analysis. *Davis II*, 233 Ill. 2d at 262; *Allen*, 401 Ill. App. 3d at 848.[2]

¶ 49                                    a. Racial Identity

¶ 50    The trial court initially found that the first factor weighed in favor of an inference of discrimination because Dr. Schacht is Caucasian while Ms. Riley is African-American. It is not entirely clear that this was the proper analysis, however, as our supreme court has provided alternative formulations for the proper focus of the first factor.

¶ 51    In discussing this factor, our supreme court historically indicated that the focus was on whether there was a racial identity between the party bringing the *Batson* challenge and the excluded potential juror. See *People v. Andrews*, 146 Ill. 2d 413, 425 (1992) (*Andrews I*); *People v. Wiley*, 156 Ill. 2d 464, 473 (1993); *People v. Williams*, 173 Ill. 2d 48, 71 (1996). However, in *Rivera I* the court made a change and altered the language of its prior opinion in *Williams* to indicate that this factor should focus on the "racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons." (Internal quotation marks omitted.) *Rivera I*, 221 Ill. 2d at 512 (quoting *Williams*, 173 Ill. 2d at 71). Under this formulation, it appears that an inference of discrimination arises where a party exercises a peremptory strike against a venireperson of a different race. Moreover, the court has, subsequently, cited to *both* its pre- and post-*Rivera I* language. Compare *People v. Houston*, 226 Ill. 2d 135, 148 (2007) (first factor focuses on " 'racial identity between the defendant and the excluded venirepersons' " (quoting *Williams*, 173 Ill. 2d at 71)), with *Davis I*, 231 Ill. 2d at 362 (focus is on the "racial identity between the party exercising the peremptory challenge and the excluded venirepersons" (citing *Rivera I*, 221 Ill. 2d at 501)).

_____

[2]We subscribe to our supreme court's most recent declaration of the appropriate standard of review applicable to the trial court's determination of whether a *prima facie* case has been demonstrated, while also noting that it previously indicated that a "manifest weight of the evidence" standard applied to this issue. See *Rivera I*, 221 Ill. 2d at 502.

¶ 52    In any case, we find that this factor properly weighs in favor of a *prima facie* case of discrimination under either focus. First, the two plaintiffs and Ms. Riley are all African-American, which satisfies the traditional test. Second, under the more recent formulation, there is a indeed a racial disparity; Ms. Riley is African-American while Dr. Schacht is not. Moreover, neither of the defendants dispute that this factor lends at least some support to the satisfaction of plaintiffs' burden to establish a *prima facie* case.

¶ 53                              b. Pattern of Strikes

¶ 54    With respect to the second factor, the trial court found that it too weighed in favor of an inference of discrimination. The trial court noted that Dr. Schacht had three peremptory challenges (not including the fourth challenge to be used in the selection of alternates), and used two of them to exclude African-Americans venirepersons from the jury. The trial court thus found that "the fact that the only strikes Dr. Schacht used were against African-Americans is sufficient to conclude that there was a racial pattern to Dr. Schacht's challenges."

¶ 55    However, a pattern of strikes is created only "where the strikes affect members of a certain race to such a degree or with such a lack of apparent nonracial motivation that it suggests the possibility of racial motivation." *Andrews I*, 146 Ill. 2d at 429. Moreover, our supreme court has specifically rejected the notion that "a pattern develops anytime a party strikes more than one juror of any race or gender." *Rivera I*, 221 Ill. 2d at 514.

¶ 56    Additionally, our supreme court has repeatedly considered the *context* of peremptory challenges when determining if any pattern actually existed. In *Rivera I*, the court declined to find a pattern, in part, because the party exercising a peremptory strike against an African-American had previously accepted one African-American veniremember and rejected another. *Id*. at 513-14. Our supreme court has further recognized that any inference of discrimination is reduced where African-Americans are challenged nonconsecutively. *Mitchell*, 152 Ill. 2d at 304; *People v. Andrews*, 155 Ill. 2d 286, 305 (1993) (*Andrews II*).

¶ 57    In this case, the record reflects that prior to his challenge to Ms. Riley, Dr. Schacht had accepted the first African-American member of the venire tendered to him before challenging the second, Mr. Okosi. He then accepted the third African-American veniremember, but that prospective juror was, subsequently, excluded by plaintiffs. Dr. Schacht, thereafter, accepted two more African-Americans before moving to strike Ms. Riley. The record, thus, reflects that Dr. Schacht did not challenge three of the African-American members of the venire tendered to him, and the two challenges he did make were nonconsecutive. We, therefore, find no discernable pattern to Dr. Schacht's challenges, and reiterate that our supreme court has specifically rejected the notion–one that is reflected in the trial court's order on remand–that "a pattern develops anytime a party strikes more than one juror of any race or gender." *Rivera I*, 221 Ill. 2d at 514.

¶ 58                        c. Disproportionate Use of Challenges

¶ 59    Our supreme court has held that a comparison of the number of African-American and non-African-American venirepersons stricken *may* reveal whether a disproportionate number

-13-

of peremptory challenges were used to exclude African-Americans. *Andrews I*, 146 Ill. 2d at 430. It is true that–as the trial court noted–Dr. Schacht only exercised peremptory challenges against African-Americans, and this fact supports an inference that his challenges were used disproportionately to exclude African-Americans. *Id*. (After noting that all eight of the State's peremptory challenges were exercised against African-American members of the venire, with none exercised to exclude veniremembers of other races, the court found "[t]his huge disparity certainly constitutes the disproportionate use of strikes against black venirepersons.").

¶ 60    However, we agree with defendants that this factor's significance is diminished in light of the small number of challenges actually at issue in this matter. Other courts have come to a similar conclusion upon similar facts. *Bennett v. Gaetz*, 592 F.3d 786, 791 (7th Cir. 2010) (where two of four peremptory challenges were used to strike African-Americans, who comprised just 5 of the 28 veniremembers, court found that "it is difficult to draw significance from this disparity, given the relatively small numbers of African-American prospective jurors and peremptory challenges in this case"); *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (while the court ultimately found–in light of other factors–that a *prima facie* case had been established where only two African-American members of venire had been struck, court recognized that "[t]wo challenges out of two venirepersons are not always enough to establish a *prima facie* case. Because the numbers are so small (and, hence, potentially unreliable), two such challenges, standing alone, may not be sufficient to support an inference of discrimination."); *People v. Bell*, 151 P.3d 292, 303 (Cal. 2007) (where California Supreme Court rejected contention that a *prima facie* case of discrimination had been established by State's challenge to two of three African-American members of venire, reasoning that "the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible").

¶ 61    Here, we are considering Dr. Schacht's exercise of two of his three possible peremptory challenges, numbers similar to those at issue in the cases cited above. Indeed, many prior decisions in which courts concluded that a disproportionate number of challenges were exercised to exclude African-Americans involved significantly higher numbers of challenges. See, *e.g.*, *Andrews I*, 146 Ill. 2d at 429 (all eight peremptory challenges directed toward African-American venirepersons); *People v. Coulter*, 230 Ill. App. 3d 209, 223 (1992) (nine of ten peremptory challenges used to exclude African-Americans); *People v. Nicholson*, 218 Ill. App. 3d 273, 283-84 (1991) (five challenges used to exclude African-Americans, while only one used to exclude a Caucasian member of the venire). The "sample size" at issue here is thus relatively small, making it difficult to draw any significant conclusions on the basis of this factor. This is not to suggest *in any way* that such a small number can never support a *prima facie* case of discrimination. We simply find, in light of all the other factors, that the small numbers at issue here diminish the significance of this factor in our overall evaluation of the strength of the *prima facie* case of discrimination in this case. See *Davis I*, 231 Ill. 2d at 360 (*all* relevant circumstances surrounding the peremptory strike must be considered). This is especially so in light of our supreme court's recognition that this kind of comparison merely "*may* reveal whether a disproportionate number of strikes was used." (Emphasis added.) *Andrews I,* 146 Ill. 2d at 430.

¶ 62                    d. Level of African-American Representation

¶ 63    We now turn to the fourth relevant factor, the level of African-American representation in the venire as compared to the jury. In its order on remand, the trial court noted that 11 of the 42-person venire (26%) were African-American and that 3 African-Americans, ultimately, served on the 12-person jury (25%). The trial court then indicated that the fact that these proportions were so similar was evidence that Dr. Schacht lacked discriminatory intent. We agree, and this factor, thus, weighs against plaintiffs' establishment of a *prima facie* case of discrimination in jury selection.

¶ 64    Nevertheless, plaintiffs contend that the trial court should actually have included the two Caucasian alternates in its comparison, and they cite to decisions which did just that in support of this contention. See *Mitchell*, 152 Ill. 2d at 304; *People v. Coulter*, 345 Ill. App. 3d 81, 90-91 (2003). However, this argument does not materially advance plaintiffs' contention that this factor should actually weigh in favor of their *prima facie* burden. Even if we assumed that the alternates should have been included, the proportion of African-Americans selected to served on the jury would drop to just over 21%. We do not find that the difference between this figure and the proportion of African-Americans on the venire (less than 5%) would undermine the trial court's conclusion that minority representation on the venire and the jury were roughly proportional. Moreover, we also note that the proportion of African-American jurors selected, including alternates, would actually have been higher than the proportion on the venire as a whole (4 out of 14, or 28%) if plaintiffs themselves had not excluded one of the African-Americans accepted by Dr. Schacht.

¶ 65    Finally, we also briefly address defendants' assertion that the proportion of African-Americans selected for the jury was even higher–38%–at the time of plaintiffs' *Batson* challenge to the strike of Ms. Riley. Defendants further contend that this is the proportion that should actually have been used for the relevant comparison, citing to our supreme court's decision in *People v. Rivera*, 227 Ill. 2d 1, 12 (2007) (*Rivera II*).

¶ 66    However, and as noted above, this factor has long called for a comparison of "the level of African-American representation in the venire as compared to the jury," not as compared solely to those members of the venire selected to serve on the jury at the time a *Batson* issue is raised. *Allen*, 401 Ill. App. 3d at 848. Moreover, while in *Rivera II* our supreme court did refuse to consider any statements or conduct in jury selection occurring after a *Batson* challenge was raised in its analysis of the *prima facie* case, it did so in the context of a unique case where the *Batson* challenge had been raised *sua sponte* by the trial court. *Id*. That factual situation is not present in here, and the decision in *Rivera II* itself indicates that this rule only applied "under the circumstances of [that] case." *Id*. As such, we do not accept defendants' argument on this issue. Nevertheless, we do find that this factor weighs in favor of the defendants and against plaintiffs' burden to establish a *prima facie* case.


¶ 67                    e. Questions and Statements During *Voir Dire*

¶ 68    The fifth factor involves consideration of the questions asked and statements made both during *voir dire* examination and while exercising peremptory challenges, as such questions and statements "may support or refute an inference of discriminatory purpose." *Batson*, 476

U.S. at 97. The trial court credited this factor to Dr. Schacht, finding in its order on remand that "the record of the jury selection process reveals no comments or questions that, on their face, reveal discriminatory intent by Dr. Schacht's counsel." Indeed, the relevant questioning all involved the veniremembers' prior medical care, medical training, and educational background. We fully agree with the trial court's finding on this factor, as our own review of the record reveals no questions or statements that indicate any discrimination.

¶ 69     We do note that in their supplemental briefs, both defendants assert that the trial court's amended analysis was flawed because–in the course of analyzing this factor–the trial court made reference to its own doubts about the reasons Dr. Schacht offered to explain the peremptory challenge to Ms. Riley. See *Fleming*, 2012 IL App (1st) 103475-U, ¶¶ 13-16 (our prior order contains a summary of the trial court's concerns, which were reflected again in its order on remand). Specifically, the trial court stated in its order on remand that "[t]he point here, however, is that there is no evidence that the question that defendant Dr. Schacht told the court was the basis of his exclusion of Ms. Riley was ever asked of her directly, or responded to."

¶ 70     Defendants contend, correctly, that reference to such matters was improper at the first step of the *Batson* analysis because reference to Dr. Schacht's explanation and the trial court's credibility findings with respect to that explanation would only be relevant after plaintiffs had established a *prima facie* case. Just as we stated in our prior order:

"[T]he trial court appears to link his conclusion as to the *prima facie* case with a consideration of Dr. Schacht's reasons for exercising a peremptory challenge to Ms. Riley. Our supreme court 'has repeatedly cautioned that the first and second steps in the process "should not be collapsed into a single, unitary disposition that dilutes the distinctions between a *** *prima facie* showing of discrimination and the *** production of neutral explanations for its peremptory challenges." ' [Citation.] As such, '[t]he party attempting to exercise a peremptory challenge is not required to provide race-neutral reasons for the exercise of its peremptory challenge if a *prima facie* case of purposeful racial discrimination has not been demonstrated.' [Citation.]" *Fleming*, 2012 IL App (1st) 103475-U, ¶ 39.

¶ 71     However, considering that the trial court nevertheless credited this factor to Dr. Schacht and that we similarly conclude that this factor weighs against a finding of discriminatory intent, we find that defendants have not been prejudiced by any error with respect to the trial court's analysis. Moreover, we also find that the trial court's error in including a credibility finding in its analysis of this factor does not require any lesser weight to be given to the fact that this factor, otherwise, weighs against plaintiffs' burden to establish a *prima facie* case.

¶ 72                              f. Heterogenous Group

¶ 73     The next factor of the *prima facie* case considered by the trial court was whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic. See *People v. McDonald*, 125 Ill. 2d 182, 196 (1988) (finding that a *prima facie* case may arise where peremptory challenges are raised "against a group of veniremen being otherwise 'as heterogeneous as the community as a whole,' sharing race

as their only common characteristic" (quoting *People v. Wheeler*, 583 P.2d 748,764 (Cal. 1978)). Upon remand, the trial court found–without further analysis–that "the only factor apparently shared by Ms. Riley and Mr. Okosi, the only two jurors excluded by Dr. Schacht, was their race." After reviewing the record, we find that this was not the case.

¶ 74    First, we again note, that only two members of the venire were challenged by Dr. Schacht. Just as we indicated in our discussion of the third factor, the small "sample size" at issue here makes it more difficult to draw conclusions on the basis of this factor. See generally *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) (in discussing the use of statistics in an employment discrimination case, the court recognized that "[c]onsiderations such as small sample size may, of course, detract from the value of such evidence").[3] Specifically, it is difficult to come to the conclusion that Mr. Oksi and Ms. Riley–just two people–alone constitute a group of people as heterogeneous as the *community as a whole*. The factual situation in this case is certainly not comparable to the one our supreme court faced in *Andrews I*, where the court found:

> "The excluded venirepersons in this case were a diverse group, with no apparent shared characteristics aside from race distinguishing them from the accepted nonblack jurors. The excluded venire members included five males and three females ranging in age from 26 to 54. Three of the venire members were married, three were divorced, and two were single. Three of the venire members were childless and the others had parented from one to 10 children. Three of the venirepersons owned homes while five rented. Four members of the group had been crime victims themselves, or had crime victims within their family. The other four had never been crime victims nor had any member of their families. The diverse occupations of the eight excluded venire members consisted of plumber, secretary/sales representative, shoe store manager, baker, laid-off lamp polisher, housewife, unemployed welfare recipient, and unemployed truck driver. Thus, the prosecutor's challenges resulted in the exclusion of a group that was ' "as heterogeneous as the community as a whole," sharing race as their only common characteristic.' [Citations.]" *Andrews I*, 146 Ill. 2d at 431-32.

¶ 75    Second, both prospective jurors did have some similarities aside from their race. For example, their educational background was similar. While Mr. Okosi had taken some post-secondary courses at a community college, neither Mr. Okosi nor Ms. Riley had completed a degree program beyond high school. They also had similar work experience; Ms. Riley worked for the post office and Mr. Okosi was employed by United Parcel Service. Finally, both Mr. Okosi and Ms. Riley specifically indicated that they had never received any medical training or education. While there may have been other ways in which Mr. Okosi and Ms. Riley were dissimilar (in gender and age, for example), in light of the above commonalities we do not agree with the trial court's determination that they shared race as their *only*

---

[3] Our citation to an employment discrimination case is apt, as the *Batson* decision itself "instructed that the procedure to be followed in a hearing on the issue of [the] discriminatory use of peremptory challenges should be similar to the one utilized in Federal Title VII employment discrimination cases." *People v. Harris*, 129 Ill. 2d 123, 177 (1989) (citing *Batson*, 476 U.S. at 94-98).

common characteristic. See *People v. Evans*, 125 Ill. 2d 50, 65 (1988) (refusing to find that this factor weighed in favor of an inference of discrimination where the four excluded members of the venire shared just two characteristics apart from their race; *i.e.*, gender and employment status); *People v. Holman*, 132 Ill. 2d 128, 176 (1989) (no inference of discrimination where three of four African-American members of the venire excluded by State shared just one characteristic apart from their race; *i.e.*, marital status).

¶ 76                                    g. Race of the Various Trial Participants

¶ 77        The seventh of the factors outlined above requires an analysis of the race of the various parties and the witnesses at trial. The trial court found that this factor weighed in favor of finding a *prima facie* case of discrimination because "both Plaintiffs and decedent are African-American and Dr. Schacht is white."

¶ 78        It is undisputed that the decedent, the plaintiffs, Mr. Okosi, Ms. Riley, and decedent's sister (a witness at trial) were African-American, while the defendants and the defense witnesses were all Caucasian–with the possible exception of defendant Dr. Ramirez who was believed to be Hispanic.[4] Furthermore, the parties on appeal do not dispute that this factor weighs in plaintiffs' favor. Thus, we see no reason to disagree with the trial court's decision to credit this factor to plaintiffs and its finding that it weighed in favor of their burden to establish a *prima facie* case of discrimination.

¶ 79                                          h. Comparative Juror Analysis

¶ 80        As noted above, in addition to an analysis of the seven factors previously discussed, the trial court may also utilize what is known as a "comparative juror analysis."

¶ 81        Under this analysis, the striking party's questions to members of the venire and the responses to those questions are evaluated to see whether otherwise similar members of the venire were treated differently because of their membership in a particular race. *Davis I*, 231 Ill. 2d at 361. However, comparative juror analysis, standing alone, is not necessarily sufficient to prove purposeful discrimination. *Id*. at 362. Instead, comparative juror analysis is an additional form of evidence to be considered as it "is just one factor in the totality of the circumstances that the court should take into consideration in considering the existence of a *prima facie* case." *Id*.

¶ 82        In its order on remand, the trial court did not mention the comparative juror analysis framework in its discussion of the plaintiffs' first-step burden to establish a *prima facie* case. Moreover, in their supplemental briefs before this court, *none* of the parties have addressed this framework in their discussion of the propriety of the trial court's amended *Batson* analysis of the *prima facie* case. We reiterate that it is plaintiffs' burden to establish a *prima*

[4]The racial composition of these trial participants is detailed in an affidavit attached to plaintiffs' posttrial motion. While–as discussed in our prior order–the parties did dispute the race of one of the other members of the venire, they have never disputed the racial composition of the parties we discuss here.

-18-

*facie* case. *Davis II*, 233 Ill. 2d at 262. Here, neither the trial court nor plaintiffs have provided this court with *any* discussion of how the comparative juror analysis favors a finding that a *prima facie* case of discrimination has been established, and we therefore "will not sift through the record or complete legal research to find support for this issue." *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 6. Therefore, our final analysis of the trial court's finding that a *prima facie* case was indeed demonstrated will be limited to a consideration of the seven factors discussed above.

¶ 83                                    i. Weighing of Relevant Factors

¶ 84       We are certainly aware that "the threshold for making out a *prima facie* claim under *Batson* is not high" (*Davis I*, 231 Ill. 2d at 360), and that the relevant standard of review on this issue calls for reversal only where the entire record leaves the reviewing court with a definite and firm conviction that a mistake has been made (*LeCompte*, 2011 IL App (1st) 100423, ¶ 16). Nevertheless, after reviewing both the trial court's order on remand and the underlying facts of this case, we find that plaintiffs have not satisfied their burden of establishing a *prima facie* case of discrimination.

¶ 85       The only relevant factors that weigh in favor of a *prima facie* case of discrimination with respect to Dr. Schacht's challenge to Ms. Riley are the first and the seventh. While the third factor–a disproportionate use of peremptory strikes against African-Americans–also supports such a finding at first glance, we find that this factor must be given less weight in light of the small number of challenges actually at issue. Moreover, and as discussed above, each of the remaining four factors actually rebuts any inference of discrimination and thus weigh against the establishment of a *prima facie* case.

¶ 86       More generally, we note that the "unchallenged presence of jurors from the protected class on the seated jury is a factor properly considered [citation] and tends to weaken the basis for a *prima facie* case of discrimination [citation]." *Rivera II*, 227 Ill. 2d at 14. Additionally, the fact that a party "had peremptory challenges remaining but did not use them to strike a black venireperson can also indicate an absence of an intent to discriminate." *People v. Hooper*, 133 Ill. 2d 469, 511 (1989). Here, Dr. Schacht accepted a total of four African-American members of the venire, and three African-American jurors, ultimately, sat on the jury. Thus, Dr. Schacht accepted *more* African-American veniremembers than he challenged, and *more* African-Americans actually served on the jury than were challenged by Dr. Schacht. Jury selection also ended with Dr. Schacht in possession of a peremptory challenge that went unused. After reviewing the entire record, we find that the trial court's finding that plaintiffs had established a *prima facie* case of discrimination was clearly erroneous.

¶ 87       Finally, only if a *prima facie* case of purposeful racial discrimination has been demonstrated does the analysis continue to the next step of the *Batson* analysis. *Rivera I*, 221 Ill. 2d at 501-02. Therefore, because no *prima facie* case has been established here, we necessarily find that no *Batson* violation occurred in this case and that plaintiffs' motion for a new trial cannot be granted on this basis. In light of this conclusion, we must now consider whether the evidentiary challenges that were also contained in plaintiffs' posttrial

motion–challenges which we declined to address in our prior order–were improperly rejected by the trial court.

¶ 88                          C. Dead-Man's Act and Hearsay Objections

¶ 89     Plaintiffs, alternatively, contend that the trial court improperly allowed evidence to be admitted at trial regarding both Dr. Schacht's numerous recommendations that decedent undergo a cystoscopy and decedent's repeated refusal to do so. As discussed above, plaintiffs contend that this evidence was admitted in violation of both the Dead-Man's Act and the general rule against hearsay, and that they were therefore entitled to a new trial. We reject plaintiffs' evidentiary challenges, because: (1) their actions below have precluded any further consideration of their arguments; (2) the evidence introduced during plaintiffs' case-in-chief opened the door to Dr. Schacht's testimony pursuant to the Dead-Man's Act; and (3) they have failed to provide this court with a sufficiently complete record on appeal.

¶ 90                                        1. Waiver

¶ 91     First, we find that plaintiffs may not be heard to complain on appeal about the admission of Dr. Schacht's conversations with decedent and evidence of decedent's refusal to consent to a cystoscopy because it was *plaintiffs* who first introduced such evidence into the proceedings.

¶ 92     Under the doctrine of invited error, a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " (Internal quotation marks omitted.) *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 820 (2008) (quoting *People v. Harvey*, 211 Ill. 2d 368, 385 (2004)). "Illinois courts have applied the invited error doctrine in numerous cases to bar a party from claiming error in the admission of improper evidence where the admission was procured or invited by that party." *In re Kenneth D.*, 364 Ill. App. 3d 797, 803 (2006). As such, when a party "procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, she cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332 (2005); *Van Holt v. National R.R. Passenger Corp.*, 283 Ill. App. 3d 62, 76 (1996) (same); *Smith v. Victory Memorial Hospital*, 167 Ill. App. 3d 618, 623 (1988) (same).

¶ 93     In this case, the record is clear that the parties vigorously disputed the admissibility of any of this evidence in the context of plaintiffs' pretrial motions. Indeed, plaintiffs supported their arguments before trial by indicating they intended to limit the relevant evidence presented at trial solely to decedent's initial meeting with Dr. Schacht in March of 2003. However, it is equally clear that–during their case-in-chief–plaintiffs actually questioned their expert regarding Dr. Schacht's overall treatment of decedent throughout 2003.

¶ 94     Specifically, plaintiffs elicited testimony from their expert that Dr. Schacht had met with decedent on a number of occasions between March and October of 2003. They also obtained opinions from their expert that Dr. Schacht violated the standard of care by failing to perform a cystoscopy on any of those occasions. Furthermore, plaintiffs elicited testimony that their expert had reviewed Dr. Schacht's notes and deposition testimony and found no evidence that Dr. Schacht offered to perform a cystoscopy or that decedent refused to consent to that

procedure. Thus, it was *plaintiffs* that first introduced the very evidence they now claim was improperly admitted at trial. Pursuant to the above authority, plaintiffs cannot maintain their challenge on appeal in light of their actions below.

¶ 95    Nevertheless, plaintiffs contend that their challenge to the admissibility of this evidence has not been waived because the trial court recognized a continuing objection to the admission of this evidence on the grounds it violated the Dead-Man's Act. Furthermore, they twice objected "for the record" during defense counsel's direct examination of Dr. Schacht.

¶ 96    We note that "the law is well established that the denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial. The moving party remains obligated to object contemporaneously when the evidence is offered at trial." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994). Moreover, "[o]rdinarily, continuing objections are not recognized unless the trial court indicates its recognition of the continuing objection." *LaSalle Bank, N.A.*, 384 Ill. App. 3d at 820 n.6.

¶ 97    Plaintiffs note that just before opening statements, plaintiffs' counsel indicated: "I just want to say on the record and immediately before the opening statements and the testimony that [defense counsel] is expected to talk about Dr. Schacht's [visits with decedent]; and when he does that, we're not waiving our objection." In response, the trial court indicated:

    "THE COURT: Absolutely. What you're doing right now is preserving the ongoing objections, those conversations coming in under the Deadman's Act, evidence or statements, as the Defendant's making.

    You're not waiving those now by not making them at trial, which we're required to do, but as a courtesy [to] counsel, we don't want to interrupt. We agree. All right. Okay."

¶ 98    As an initial matter, it is not entirely clear whether this exchange was intended to refer to an ongoing objection to this evidence being presented at trial, or simply to an objection to defense counsel's referencing any such anticipated evidence during his opening statements. As such, we are not entirely convinced that this exchange supports plaintiffs' contention that the trial court recognized an ongoing objection to this evidence being admitted at trial.

¶ 99    More importantly, however, plaintiffs' contention that they either obtained a continuing objection or properly objected at trial is simply irrelevant in light of the discussion above. It was not plaintiffs' failure to preserve its objection to *defendant's* introduction of this evidence that caused them to forfeit this issue on appeal. Rather, it was their *own* initial introduction of that same evidence which has resulted in this waiver. See *Krklus v. Stanley*, 359 Ill. App. 3d 471, 486 (2005) (claim that evidence was improperly admitted at trial rejected, in part, where appellant "actually interjected the matter into trial for the first time in her case in chief during direct examination").

¶ 100    We next consider plaintiffs' contention that by questioning their own expert regarding Dr. Schacht's numerous examinations of decedent and his purported conversations with decedent, they did not waive their objection to the introduction of that evidence. Plaintiffs contend that their argument is supported by this court's decision in *Theofanis v. Sarrafi*, 339 Ill. App. 3d 460 (2003). In that medical malpractice case, this court found that the trial court

-21-

improperly allowed a defendant doctor (Dr. Sarrafi) to testify from his notes about a specific examination of, and conversation with, a deceased former patient in violation of the Dead-Man's Act. *Id*. at 478. We found that this evidence was improperly introduced because, in their case-in-chief, plaintiffs had not introduced any evidence regarding that specific examination. *Id*. Importantly, this court also found that "[p]laintiffs' later examination of their expert concerning Sarrafi's notes, brought in response to Sarrafi's improper testimony, did not serve to waive retrospectively the timely objection to Sarrafi's prior testimony." *Id*.

¶ 101 Here, plaintiffs contend that the situation in this case is "analogous to the situation in *Theofanis*." Specifically, they argue that because their expert was "an out of town expert and the court was firm in its decision to allow Dr. Schacht's testimony regarding the decedent's conversations, [the expert's] testimony was given in anticipation of Dr. Schacht's testimony." We disagree, as on its face the situation is significantly different in this case.

¶ 102 It is one thing to say–as we did in *Theofanis*–that when plaintiffs' own evidence was "narrowly confined" and evidence violative of the Dead-Man's Act is, thereafter, introduced by defendant at trial over a timely objection, the representative of a deceased does not *retrospectively* waive that timely objection by, subsequently, introducing similar evidence in response. *Id*. It is quite another thing to say that any objection is not waived when an estate representative *prospectively* introduces that same evidence in the first instance and in anticipation of some other evidence that may or may not, subsequently, be produced at trial. Indeed, and as we explain further below, such a rule would directly contradict the very first exception contained in the Dead-Man's Act itself. See 735 ILCS 5/8-201(a) (West 2008).

¶ 103 Under the unique facts of this case, plaintiffs have failed to properly preserve their objection on the basis of the Dead-Man's Act. Additionally, they have also failed to preserve their objection to Dr. Schacht's testimony regarding decedent's statements on the grounds it was inadmissible hearsay. As noted above, the denial of a motion *in limine* does not preserve an objection to disputed evidence because the moving party must also offer an objection when the evidence is offered at trial. *Illinois State Toll Highway Authority*, 163 Ill. 2d at 502. The record reflects that in this case, plaintiffs neither obtained a continuing objection on this basis nor objected to Dr. Schacht's testimony at trial on the grounds that it was hearsay.

¶ 104                                    2. Dead-Man's Act

¶ 105 We also find that, substantively, the evidence plaintiffs produced during their case-in-chief opened the door to Dr. Schacht's subsequent testimony under the first exception contained in the Dead-Man's Act.

¶ 106 As we previously noted, the Dead-Man's Act provides: "In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability ***." 735 ILCS 5/8-201 (West 2008). However, the Dead-Man's Act also contains several exceptions, the first of which provides: "If any person testifies on behalf

-22-

of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." 735 ILCS 5/8-201(a) (West 2008).

¶ 107    A number of cases have recognized the applicability of this exception in circumstances similar to those here. For example, in *Hoem*, 159 Ill. 2d at 201-02, the plaintiff and surviving spouse in a medical malpractice action introduced expert testimony explaining notes prepared by a defendant doctor regarding his examination of the decedent. Our supreme court found that the introduction of the notes and the expert testimony of the plaintiff's expert "opened the door" under the first Dead-Man's Act exception so as to allow the defendant doctor to testify regarding that same examination. *Id*. Specifically, the court held that the expert had "put his gloss on the notes," and therefore it would be "fundamentally unfair to deny [the defendant doctor] an opportunity to explain his view of what happened." *Id*.

¶ 108    This court has reached a similar conclusion upon being presented with similar facts in *Malanowski*. There, the plaintiffs' expert (Dr. Seltzer) testified that, based upon his review of a note prepared by the defendant doctor (Dr. Jabamoni) following a consultation, a biopsy was not offered to the deceased on that date. *Malanowski*, 332 Ill. App. 3d at 12. Relying on the *Hoem* decision, we found that this testimony opened the door under the Dead-Man's Act to allow the defendant doctor to testify that she did in fact recommend such a procedure on that date. *Id*. at 13. Specifically, we reasoned:

    "[A]llowing the representative of the deceased to introduce his version of what course of action Dr. Jabamoni recommended or failed to recommend, without giving an equal opportunity to Dr. Jabamoni, would not advance the policy behind the Act. Specifically, the questions posed to Dr. Seltzer by plaintiff's counsel assumed that Dr. Jabamoni failed to offer certain treatment options to the decedent. Under these circumstances, we, like the court in *Hoem*, find it fundamentally unfair to deny Dr. Jabamoni an opportunity to explain her version of what happened. Left unchallenged, Dr. Seltzer's version would have remained with the jury as the only testimony regarding the conversation between Dr. Jabamoni and [the decedent]." *Id*.

¶ 109    Finally, this court again considered similar facts in *Agins v. Schonberg*, 397 Ill. App. 3d 127 (2009). There, plaintiff's case-in-chief included testimony from several witnesses suggesting that the defendant doctor (Dr. Schonberg) had visited with the decedent on multiple occasions. *Id*. at 132. This court found that this testimony permitted Dr. Schonberg to take advantage of the Dead-Man's Act exception and refute this testimony. This court reasoned that the implication from the testimony presented by the plaintiff was that:

    "Dr. Schonberg had the opportunity to evaluate decedent but did not examine him or did not do all that he could to follow-up with decedent. Under these circumstances, this court, like the court in *Hoem* and *Malanowski*, finds it would be fundamentally unfair to deny Dr. Schonberg an opportunity to explain what happened. Left unchallenged, plaintiff's version, *i.e.*, that Dr. Schonberg examined decedent on several occasions over the course of several months and failed to diagnose and treat the cancer, would have remained with the jury as the only testimony regarding decedent's supposed visits to Dr.

-23-

Schonberg. Accordingly, the trial court did not abuse its discretion by permitting Dr. Schonberg's testimony. To hold otherwise would not serve the intended purpose of the Act, namely, to preclude a one-sided picture of the events." *Id*. at 134.

¶ 110    In this case, plaintiffs' expert testified during plaintiffs' case-in-chief that he had reviewed Dr. Schacht's notes and deposition testimony and saw no evidence that Dr. Schacht offered to perform a cystoscopy or that decedent refused to consent to that procedure. Indeed, he testified that he saw no such evidence with respect to Dr. Schacht's treatment of decedent on a number of occasions between March and October of 2003. Finally, plaintiffs' expert testified that decedent's refusal to consent to a cystoscopy would be "an important piece of information," and he agreed with plaintiffs' counsel that "[i]n medicine, [the] failure to document an important piece of information concerning the management of a patient means that it didn't happen." In light of this testimony, we find that it would be fundamentally unfair to Dr. Schacht if the statutory exception contained in section 8-201(a) of the Dead-Man's Act was not applied here so as to allow him to "explain his view of what happened." *Hoem*, 159 Ill. 2d at 201-02.

¶ 111                                          3. Record on Appeal

¶ 112    Finally, even if we were to find that evidence was improperly admitted at trial, we would affirm due to the lack of a sufficiently complete record on appeal.

¶ 113    The record reflects that shortly after plaintiffs filed their notice of appeal, the parties completed a stipulation to limit the record on appeal. The parties were certainly free to do so, as Supreme Court Rule 321 provides: "The record on appeal shall consist of the judgment appealed from, the notice of appeal, and the entire original common law record, unless the parties stipulate for, or the trial court, after notice and hearing, or the reviewing court, orders less." Ill. S. Ct. R. 321 (eff. Feb. 1, 1994). Nevertheless, "it is the appellant's burden, not the appellee's burden, to present a sufficiently complete record of the proceedings at trial to support a claim of error." *In re Marriage of Baniak*, 2011 IL App (1st) 092017, ¶ 30. Furthermore, "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id*. More specifically, this court has previously noted:

> "Trial error does not occur in a vacuum and that the ultimate issue a reviewing court must decide is not merely whether error occurred, but whether any error that occurred unfairly prejudiced the appellant's position, thereby denying appellant a fair trial. To make such a determination it is most often necessary for the reviewing court to consider the alleged error in the context of the entire proceeding. This is the reason that an appellant generally presents a complete transcript of the proceedings below. By supplying the reviewing court with a full report of the trial proceedings, the court will be able to fairly review the matters presented for its consideration." *Jackson v. Naffah*, 241 Ill. App. 3d 1043, 1045 (1993).

¶ 114    Here, the record on appeal contains some notable omissions. The trial transcripts provided do not include the parties' opening statements or closing arguments, the final instructions given to the jury at the conclusion of trial, or the return of the jury's verdict. As already noted, the common law record omits plaintiffs' written motion *in limine* regarding

-24-

Dr. Schacht's testimony. We, therefore, have no indication of how the parties presented the evidence produced at trial to the jury, nor do we know how the jury was instructed to consider that evidence. Indeed, we do not know how the jury was instructed on the ultimate issues of negligence, causation, or the burden of proof. Thus, even if it appeared that improper evidence was admitted at trial, we would be unable to determine whether that evidence "unfairly prejudiced plaintiff[s], materially affected the outcome of the case, or was harmless." *Id*. at 1048.

¶ 115                                  III. CONCLUSION

¶ 116        For the foregoing reasons, we: (1) find that the portion of the order on remand which granted plaintiffs a new trial is void for lack of jurisdiction; (2) reject the trial court's amended conclusion that plaintiffs have demonstrated a *Batson* violation, in light of our conclusion that a *prima facie* case of discrimination was not established; and (3) affirm the trial court's original conclusion that plaintiffs' evidentiary challenges did not entitle them to a new trial. We therefore vacate that portion of the order on remand which granted plaintiffs a new trial and affirm the trial court's initial denial of plaintiffs' posttrial motion for a new trial.

¶ 117        Affirmed in part and vacated in part.

¶ 118        JUSTICE HALL, dissenting.

¶ 119        I respectfully dissent for two reasons. First, I do not believe the trial court acted outside the scope of our mandate upon remand when it granted plaintiffs a new trial on their *Batson* claim. And second, I do not believe the trial court erred on remand by finding that the plaintiffs established a *prima facie* case of discriminatory use of peremptory challenges.

¶ 120        Whether a trial court has complied with a reviewing court's mandate is a question of law subject to *de novo* review. *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 351-52 (2002). When a reviewing court remands a matter to the trial court for further proceedings, the trial court is obligated to proceed in accordance with the reviewing court's mandate. *In re Marriage of Jones*, 187 Ill. App. 3d 206, 215 (1989). However, when the reviewing court's mandate is not specific, the trial court must examine the nature of the case to determine what further proceeding would be consistent with the opinion. *Pioneer Trust & Savings Bank v. Zonta*, 96 Ill. App. 3d 339, 344 (1981); *People v. Abraham*, 324 Ill. App. 3d 26, 30 (2001).

¶ 121        In the previous appeal of this case, we found that the trial court impermissibly collapsed the three-step *Batson* analysis. *Fleming v. Moswin*, 2012 IL App (1st) 103475-U. We issued a nonspecific mandate remanding the cause back to the trial court with directions to conduct a three-step analysis under *Batson* to determine if counsel for Dr. Mark Schacht had used his peremptory challenge to exclude Ms. Betty Riley on account of her race. *Id*.

¶ 122        Upon remand, the trial court conducted the analysis and determined that counsel had used his peremptory challenge to exclude Ms. Riley on the basis of her race in denial of her

federal constitutional right to equal protection under *Batson*. The trial court concluded that the plaintiffs were entitled to a new trial because of the *Batson* violation.

¶ 123 I do not believe that the trial court's action in granting plaintiffs a new trial exceeded the scope of our mandate upon remand or was inconsistent with a retention of jurisdiction in this court. In construing the language of a mandate, matters that are implied by the mandate are considered embraced by it. *PSL Realty Co. v. Granite Investment Co.*, 86 Ill. 2d 291, 308 (1981). I believe that the trial court's authority to grant plaintiffs a new trial for the *Batson* violation was, at the very least, implied in our nonspecific mandate where we directed the court to conduct a full *Batson* analysis and then enter findings of fact and conclusions of law.

¶ 124 I disagree with the narrow interpretation the majority gives to the mandate we issued in this case. When this cause was remanded and the mandate issued, the trial court was vested with jurisdiction to proceed in accordance with the mandate. In our mandate, we directed the trial court to conduct a full *Batson* analysis on plaintiffs' motion for a new trial and to make findings of fact and conclusions of law with respect to that issue. As a result, I believe that pursuant to our mandate, the trial court was empowered with the jurisdiction to grant plaintiffs' motion for a new trial as a remedy for the *Batson* violation.

¶ 125 That jurisdiction empowered the trial court to make an arguably wrong *Batson* decision, as well as an arguably correct decision. This is why we retained jurisdiction in order to review the trial court's ruling on the *Batson* matter and we permitted the parties to submit supplemental briefs following the outcome of the *Batson* hearing on remand. We also retained jurisdiction to address remaining issues raised on appeal. On this issue, I believe the trial court acted within the scope of our nonspecific mandate and, thus, did not exceed its jurisdiction in granting plaintiffs a new trial on their *Batson* claim.

¶ 126 Finally, I do not believe the trial court erred in finding that plaintiffs successfully established a *prima facie* case of discriminatory use of peremptory challenges by counsel for Dr. Schacht. In order to establish a *prima facie* case of discrimination in the selection of jurors under *Batson*, a party must show that the exercise of peremptory challenges removed one or more members of a cognizable racial group from the venire, and that the facts and other relevant circumstances support an inference that these challenges were used to exclude potential jurors on the basis of their race. *People v. Caine*, 258 Ill. App. 3d 599, 603 (1994); see also *Johnson v. California*, 545 U.S. 162, 170 (2005) ("a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

¶ 127 Relevant circumstances include, but are not limited to: (1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses. *People v. Davis*, 231 Ill. 2d 349, 362 (2008).

¶ 128      In this case, an examination of the relevant circumstances could reasonably lead a trial judge to infer the existence of racial discrimination in jury selection. The jury pool consisted of 42 people, of whom 15 were excused for cause or agreement, leaving 27 members to be selected, 8 of whom were black, and 19 of whom were nonblack.

¶ 129      Each side was given seven peremptory challenges. The defense split their challenges, with four challenges going to Dr. Arthur Moswin and three going to Dr. Schacht. Dr. Moswin used two of his four challenges to excuse two blacks, prospective jurors Ms. Simon and Mr. Wilson. Counsel for Dr. Schacht used two of three peremptory challenges to exclude two blacks, prospective jurors Mr. Okosi and Ms. Riley.

¶ 130      Although these strikes by themselves might not be sufficient to establish a pattern of strikes, taken together, they are still highly relevant when you consider the small pool of potential black jurors, and that the excluded prospective black jurors were essentially heterogenous individuals whose race was their only common characteristic. This factor is even more significant given that in certain circumstances, the peremptory challenge of a single black juror can give rise to an inference of discrimination. *People v. Holmes*, 272 Ill. App. 3d 1047, 1057 (1995).

¶ 131      Moreover, the presence of a few blacks on a jury does not necessarily defeat an inference of racial discrimination in jury selection. See, *e.g.*, *People v. Gaston*, 227 Ill. App. 3d 486, 489-90 (1992) (prosecutor's use of four out of five peremptory challenges against black individuals established *prime facie* case of discriminatory use of the challenges thereby shifting burden to State to produce race-neutral explanations for the challenges even though four blacks served on the jury). On balance, the relevant circumstances established a *prima facie* case of racial discrimination in jury selection which shifted the burden to the defendants to come forward with race-neutral explanations for their challenges. I believe the trial court properly concluded that the plaintiffs established a *prima facie* case of discriminatory use of peremptory challenges by Dr. Schacht's counsel.